BOARD OF SCHOOL DIRECTORS OF THE CITY OF MILWAUKEE, Petitioner and Respondent: MILWAUKEE TEACHERS' UNION LOCAL 252 and another, Cross-Petitioners and Respondents, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Appellant. [Case No. 213.] *

MILWAUKEE TEACHERS' EDUCATION ASSOCIATION, Respondent, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Appellant. [Case No. 214.] *

MILWAUKEE TEACHERS' UNION LOCAL 252, affiliated with American Federation of Teachers, AFL-CIO, Respondent, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Appellant: BOARD OF SCHOOL DIRECTORS OF THE CITY OF MILWAUKEE, Intervening Respondent. [Case No. 215.] *

*Nos. 213, 214, 215. Argued April 1, 1969.—Decided June 3, 1969.*
(Also reported in 168 N. W. 2d 92.)

---

* Motion for rehearing denied, without costs, on September 8, 1969.

638

For the appellant the cause was argued by *David J. Hanson,* assistant attorney general, with whom on the briefs were *Bronson C. La Follette,* attorney general, and *William H. Wilker,* assistant attorney general.

For the petitioner-respondent Board of School Directors of the city of Milwaukee there was a brief by *John J. Fleming,* city attorney, *Harry G. Slater,* deputy city attorney, and *Carl F. Kinnel,* assistant city attorney.

For the petitioner-respondent Milwaukee Teachers' Education Association there was a brief by *Lawton & Cates* and *Robert C. Kelly,* all of Madison, and oral argument by *Mr. Kelly.*

For the petitioner-respondent Milwaukee Teachers' Union Local 252 there was a brief by *Goldberg, Previant & Uelmen* and *John S. Williamson, Jr.,* all of Milwaukee, and oral argument by *Mr. Williamson.*

HANLEY, J. The following issues are presented in this appeal:

(1) Is it a prohibited practice within the meaning of sec. 111.70 (3) (a), Stats., for a municipal employer and the certified exclusive representative of its employees to enter into an agreement for the exclusive checkoff of dues;

(2) Is it a prohibited practice within the meaning of sec. 111.70 (3) (a), Stats., for the school board to deny a representative of a minority union the right to speak on bargainable subjects at public meetings of its various committees where the sole reason for such denial is the representative's minority status;

(3) Is a municipal employer required to grant lists of new teachers and other information concerning employees which are not public records under sec. 14.90, Stats., to all organizations which claim to represent these employees?

We think that in addition to the above issues there is a preliminary issue which must be considered which affects this entire matter. The issue is whether the certified majority representative of an employee union in municipal employment is the exclusive bargaining agent for all the employees in that union. We shall consider that issue first.

### Majority Union Is Exclusive Bargainer.

Subch. IV of ch. 111, Stats., is intricately involved in this entire controversy. The entire subchapter consists of one section, *i.e.*, sec. 111.70. Basically, the section is concerned with the right of municipal employees to organize and join labor organizations.

Sec. 111.70, Stats., was created by the Laws of 1959, ch. 509. When enacted, no provision was made for the election of a majority union representative. However, the Laws of 1961, ch. 663, created sec. 111.70 (4), which specified certain procedures to be used in determining the majority union representative.

Sec. 111.70, Stats., does not now specifically state, nor has it ever so stated, that the majority union representative is the exclusive bargaining representative for all the employees. Yet, all the parties to this appeal, including the minority union, concede that it should be so interpreted or there would be little point in having an election to determine the majority union representative.

The situation was discussed in a recent article in the Wisconsin Law Review:

"The statute as it presently exists does not expressly authorize exclusive recognition. However, the Board [WERC] has certified unions as exclusive representatives

for the purpose of collective bargaining, and municipal employers have recognized unions as exclusive representatives of all employees within a particular unit. The statute lends itself to a construction which supports the authority of the Board to certify the majority representative as the exclusive representative . . .

"In 1961 the legislature granted the Board certain administrative powers which were not given in 1959. Section 111.70 (4) (d) provides that a union or the municipal employer may petition the Board to conduct an election whenever a question arises between a municipal employer and a labor union as to whether the union represents the employees of the employer. The provision directs the Board to determine questions of representation by following, insofar as applicable, the proceedings outlined in sections 111.02 (6) and 111.05 which govern representation questions in private employment. Section 111.05 (1) provides that the representative chosen by the majority of the employees in a collective bargaining unit shall be the exclusive representative of all the employees in such unit for purposes of collective bargaining. Section 111.02 (6) provides that the term 'collective bargaining unit' shall mean all of the employees of one employer and then provides for the creation of separate units. The Board has decided that section 111.70 (4) (d), together with 111.05 and 111.02 (6), authorizes certification of exclusive representatives for purposes of collective bargaining." 1965 Wis. L. Rev. 671, 673–675.

The WERC's construction of sec. 111.70, Stats., was also approved in the Marquette Law Review by Professor Reynolds C. Seitz:

"Although there have been some technical arguments to the effect that the Wisconsin Statute did not provide for exclusive bargaining with the organization held to represent the majority in an appropriate unit the Wisconsin Employment Relations Board has interpreted Section 111.70 (4) (d) of the Act as so providing. . . ." 49 Marq. L. Rev. 487, 496.

It should be noted in passing that while this court has never specifically decided whether sec. 111.70, Stats., provides for exclusive representation, by implication the court has approved such a construction. In *Milwaukee*

*County Dist. Council v. Wisconsin Employment Relations Board* (1964), 23 Wis. 2d 303, 304, 127 N. W. 2d 59, this court entertained an action to review the WERC's certification of the Milwaukee Garbage Collection Laborers Independent Local Union as the:

". . . *exclusive* collective-bargaining representative for city employees in a particular bargaining unit . . ." (Emphasis supplied.)

The WERC's certification was approved without any comment concerning its exclusiveness. Again in *Joint School Dist. No. 8 v. Wisconsin Employment Relations Board* (1967), 37 Wis. 2d 483, 486, 155 N. W. 2d 78, this court referred to Madison Teachers, Inc., as:

". . . the exclusive collective-bargaining representative of the nonsupervisory teachers employed by the school . . . ."

No mention was made of the exclusive nature of the representation. While it must be conceded that exclusivity was not an issue in the cases cited above, the failure to object to the WERC's construction of sec. 111.70, Stats., amounts to a tacit approval.

Finally, there is another factor which should be considered.

". . . the construction and interpretation of a statute adopted by the administrative agency charged with the duty of applying the law is entitled to great weight. . . ." *Cook v. Industrial Comm.* (1966), 31 Wis. 2d 232, 240, 142 N. W. 2d 827.

The WERC has reasonably concluded that sec. 111.70, Stats., provides for the certification of the majority union as the exclusive bargainer. We approve of that construction.

*Exclusive Checkoff.*

Sec. 111.70 (3) (a), Stats., prohibits a municipal employer from

"1. Interfering with, restraining or coercing any municipal employe in the exercise of the rights provided in sub. (2) [joining or not joining a labor organization].

"2. Encouraging or discouraging membership in any labor organization . . . by discrimination in regard to hiring, tenure or other terms or conditions of employment."

Obviously, this section must be given a realistic construction. An employer who recognizes the duly elected majority union representative as the exclusive bargaining agent for all the employees has encouraged membership in the majority union to a certain extent. That would hardly be a prohibited practice. This distinction was both recognized and discussed in the memorandum accompanying the declaratory ruling of the WERC in this case.

"Obviously any difference in treatment accorded to *organizations* purporting to represent the employes of municipal employers opens the door to a charge of discrimination.

"However, the fact that Section 111.70 allows distinctions to be made between the rights of competing organizations claiming to represent municipal employes does not mean said statute is per se unconstitutional. As long as the basis for affording certain rights or withholding certain rights to organizations is on a rational basis, the statute cannot be said to be unconstitutional. .

"Clearly there is a rational basis for affording certain privileges to an organization representing a majority of the employes and for denying the same privileges to a minority organization.

"Equal treatment to a minority organization, in some respects, is not required after the majority representative has been established, since Section 111.70 (4) (d), (b) and (i) permit municipal employers to make distinctions between an organization which represents a majority of its employes and minority organizations. Therefore, certain rights and benefits granted by the municipal employer to the exclusive representative, and not to any minority representatives, would not constitute unlawful interference, restraint or coercion, or discrimination within the meaning of Section 111.70 (3)."

*"Those rights or benefits which are granted exclusively to the majority representative,* and thus denied to minority organizations, *must in some rational manner be related to the functions of the majority organization in its representative capacity,* and must not be granted to entrench such organization as the bargaining representative." (Emphasis supplied.)

The emphasized portion of the last paragraph succinctly states the proper test which should be applied in this area. It only remains to be seen whether the WERC applied its own test in the matters at hand.

In discussing the propriety of exclusive checkoff, the WERC concluded:

". . . While the check-off of dues in favor of the majority . . . is more than a convenience to the organization involved, we do not consider an exclusive check-off in favor of only the majority representative to constitute any prohibited practice under Section 111.70. It is one of the privileged acts of cooperation to which the majority representative is entitled, if the municipal employer so desires, as a result of the choice made by the majority of the employes in the collective bargaining unit."

The WERC made no attempt to explain how the granting of exclusive checkoff was rationally related to the functioning of the majority organization *in its representative capacity;* nor can we see any relationship whatsoever. The sole and complete purpose of *exclusive checkoff* is self-perpetuation and entrenchment.[4] While a majority representative may negotiate for checkoff, he is

---

[4] Agreements which seek to perpetuate the majority representative are often referred to as "union security" provisions. Most often "union security" agreements require that employees in a given unit must be members of the majority union to keep their jobs. Assembly Bill 389 (1965) would have authorized a municipal employer to enter into a "union security" agreement. The Senate failed to override the governor's veto by one vote and the bill was rejected.

An exclusive checkoff agreement, while not nearly as effective as a "union security" agreement, certainly falls into the same family.

negotiating for all the employees, and, if checkoff is granted for any, it must be granted for all.

While the interpretation given to an administrative agency's interpretation of a statute is entitled to great weight, the construction of a statute is still a question of law and this court is not bound by the agency's construction. *Johnson v. Chemical Supply Co.* (1968), 38 Wis. 2d 194, 156 N. W. 2d 455. We think an exclusive checkoff agreement is a prohibited practice as a matter of law.

### *Refusal to Allow Minority Representative Speaking Privileges.*

The minority union, MTU, complains that its representative was denied the right to speak at a public meeting in violation of the Wisconsin Constitution, and in violation of sec. 111.70 (3) (a), Stats. (by the school board) and sec. 111.70 (3) (b) (by the MTEA).

The Wisconsin Constitution provides in part:

Art. I, sec. 3: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech . . . ."

Art. I, sec. 4: "The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

In addition to the constitutional provisions, it is the stated policy of the state of Wisconsin that:

". . . the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental affairs and the transaction of governmental business." Sec. 14.90 (1), Stats.

The WERC concluded that the constitutional and statutory provisions could best be satisfied by permitting

minority union representatives speaking privileges at public meetings. Thus the minority union had the same privileges as every other citizen. In implementing this policy decision, the WERC found that the school board committed the prohibited practice of interfering with the free exercise of employee rights in violation of sec. 111.70 (3) (a) 1, Stats. Moreover, the MTEA (majority union) by agreement with the school board on the policy which denied the minority union the right to be heard, had itself committed the prohibited practice of interfering with the rights of other employees in violation of sec. 111.70 (3) (b) 1.

The circuit court reversed the WERC on the ground that a minority union had no right to negotiate with the employer, and that if the employer negotiated with the minority union, that in itself would be a prohibited practice.

"For the employer to negotiate with the minority Union would be a prohibited practice of interfering with, restraining or coercing any municipal employee in the exercise of his rights to join or not join a union, and the penalty would be proceedings under sec. 111.07 to prevent such prohibited practice.

". . .

"To permit the minority Union to negotiate wages and conditions of employment in a public meeting would be far more reprehensible than for the School Board to meet privately and to negotiate with the minority Union, all of which of course would be a prohibitive practice violative of sec. 111.70 (3) (a) 1."

All of the parties to this case agree that a minority union cannot negotiate with the employer. The minority union itself included the following statement in its brief:

"The Commission [WERC] correctly recognized that a municipality at least has some kind of obligation to negotiate with the majority union, but none to negotiate with a minority union. . . . More accurately, the municipality is prohibited from negotiating with a minority union. . . ."

Although the parties to this case all agree that the minority union cannot negotiate with the employer, they do not all agree that a statement at a public meeting is "negotiating."

The WERC stated in its memorandum that:

"An appearance at a public hearing on the budget is not to be equated with collective bargaining in public employment. . . ."

In its brief the WERC contends that

". . . a statement of position at a public meeting is not to be equated with negotiations . . ."

The MTEA, on the other hand, feels that a discussion at a public meeting is indeed "negotiating."

". . . the only difference between negotiating with the minority at the bargaining table or in negotiating with it at a public meeting is one of degree, the degree of interference with the rights of the majority."

Quite obviously, the determination of this issue turns on the interpretation given to "negotiating."

"Negotiate" is defined in Webster's New International Dictionary (3d ed.) as:

". . . 1: to communicate or confer with another so as to arrive at the settlement of some matter: meet with another so as to arrive through discussion at some kind of agreement or compromise about something: come to terms esp. in state matters by meetings and discussions . . . ."

If this case involved solely the giving of a position statement at an ordinary meeting of a public body, we would have some difficulty in labeling the conduct "negotiating." But there is an additional factor involved here.

Sec. 14.90, Stats. (the Anti-Secrecy Act) provides that no formal action of any kind shall be introduced, deliberated upon or adopted at any closed executive session or closed meeting of any state and local governing and

administrative bodies. Certain exceptions are provided to that act.

An attorney general's opinion (54 Op. Atty. Gen. (1965), Introduction, vi) found one of the exceptions sufficiently broad to cover the negotiations between a municipality and a labor organization. However, it is clear that the formal introduction, deliberation and adoption by the elected body of the bargaining recommendations must be at open meetings.

" 'Whether the teacher salary proposals submitted by the teachers' committee and the counter proposals made by the school board are preliminary in nature and for bargaining reasons need to be discussed in a closed session is basically a question of fact to be decided by the school board. If the board finds that the bargaining process can best be carried on in private, the meeting may be closed. If the board finds no necessity for bargaining in private, the meeting should be open to the public. In any event, when the bargaining period is past, *no final action should be taken on the teachers' salary schedule until they are made public and discussed in an open public meeting.*' " 54 Op. Atty. Gen. (1965), Introduction, vi. (Emphasis supplied.)

The open meeting is the necessary and final step in the "negotiation" process between the school board and the majority teachers' union.

The proposed agreement submitted by the school board's bargaining committee does not have to be accepted by the school board. If the recommendations of the committee automatically were approved by the school board, then the anti-secrecy law has been violated and the open meeting is nothing but a sham.

On the other hand, if the minority union representative is permitted to influence the decision of the school board by his argument, then he is truly "negotiating."

When individuals not representing the minority union argued their positions at the meetings in question, they were questioned by the committee members who were

holding the meeting.[5] If a two-sided conversation is the necessary element for "negotiations," the negotiations would indeed take place at a public meeting if a minority union representative were permitted to speak.

If the minority union representative met privately with the municipal employer to discuss negotiable topics, *i.e.*, wages, hours, and conditions of employment, the employer would certainly have committed a prohibited practice. To permit such a discussion under the guise of a public meeting is just as improper.

We conclude that the WERC's determination on the issue of speaking privileges was unreasonable and it is not binding on this court.

### List of Teachers.

One of the questions submitted by the school board as part of the declaratory ruling proceeding was whether a municipal employer could grant the majority union exclusive access to a list of newly employed teachers, their

---

[5] For example, on August 27, 1964, the minority union representative was denied the right to speak on negotiable subjects at a public joint meeting of the Committee on Finance and the Committee on Buildings (subcommittees of the school board). A Mr. Gill, who represented the Citizen's Governmental Research Bureau, was permitted to speak. A dialogue between Mr. Gill and the committee members occurred.

Likewise on October 14, 1964, the school board itself was meeting. The minority union representative was again refused permission to speak on a negotiable topic on the ground that

". . . If we recognize the competing union or the representative thereof, we are permitting that representative the opportunity to influence us. . . ."

Again, on October 14, 1964, Mr. Gill made an oral presentation to the board. At the conclusion of Mr. Gill's remarks, the school board members were directed to question him or comment on his remarks. Such comment did, in fact, occur. Some other members of the public who spoke at the meeting were Reverend Paul Gendell, Mr. Howard Haverson, and Mr. Sam Brown. After each of these people spoke, the committee members were invited to comment or to question the speaker.

addresses and related data. Frankly, there is very little difference between the position taken by the WERC and the circuit court.

The WERC declared that in private employment, where an employer had an obligation to engage in collective bargaining with the majority representative, the employer was obligated to furnish relevant data concerning the employees to the majority union. This arrangement made it possible for the majority representative to properly carry out its duties as the exclusive bargaining agent. However, in the public employment area, and particularly in Wisconsin, the names, addresses, salaries and working conditions of the teachers, or any municipal employee, are a matter of public record.[6] Thus, an employer could not grant anyone exclusive access to public records. Such was the position stated by the WERC in its memorandum accompanying its declaratory ruling.

However, in its declaratory ruling, the WERC stated that a municipal employer could grant the majority union exclusive access to

". . . the list of newly employed teachers and their addresses, when necessary to perform its function as the exclusive collective bargaining representative of the teaching staff, if said list is not otherwise available as a public record for public inspection."

The trial judge was a little bit more specific in discussing access to the list in question. He unequivocally stated that the list of new teachers and salaries is a public record and the school board may not deny access to it to any citizen. He further stated that the only reason a labor organization would want the list would be to solicit members and that the majority union's contention that it wanted to check with the new teachers to see if their

---

[6] Sec. 18.01, Stats., provides that the records of a municipality are generally public. While the right to inspect public documents and records is not absolute, a minority teachers' union would certainly have a sufficient interest to inspect public records concerning teachers. *State ex rel. Youmans v. Owens* (1965), 28 Wis. 2d 672, 137 N. W. 2d 470, 139 N. W. 2d 241.

contracts were in accordance with the negotiated scale was a sham.

The only difference between the position of the WERC and the position of the circuit court is that the WERC answered the hypothetical question—"Can a municipal employer grant to the majority union exclusive access to nonpublic bargaining data?" The WERC answered the question "Yes," but the circuit court did not answer it at all.

Although it would appear that the WERC has applied the proper test (referred to earlier in the opinion) to this portion of the dispute, we do not believe the court should answer this hypothetical question. It is one thing to review a declaratory ruling; and it is quite another thing to render an advisory opinion. The court has always declined to decide speculative issues. The declaratory ruling which was requested involved real facts and was capable of resolution. Once it is determined, however, that the list in question was a public record, no further review of the question is necessary.

We agree with the WERC's finding and the circuit court's finding that the list of teachers was a public record.

*By the Court.*—Judgments affirmed.

ROBERT W. HANSEN, J., took no part.