CITY OF MADISON JOINT SCHOOL DISTRICT No. 8, City of Madison, Villages of Maple Bluff and Shorewood Hills, Towns of Madison, Blooming Grove, Fitchburg and Burke; and its agent the Board of Education, City of Madison Joint School District No. 8, Appellants, v. WISCONSIN EMPLOYMENT RELATIONS COMMISSION, Respondent: MADISON TEACHERS, INCORPORATED, Intervenor-Respondent.*

*No. 410. Argued April 7, 1975.—Decided June 30, 1975.*
(Also reported in 231 N. W. 2d 206.)

* Motion for rehearing denied, without costs, on September 30, 1975.

For the appellants there was a brief by *Edwin C. Conrad,* city attorney, and *Gerald C. Kops,* assistant city attorney, and oral argument by *Mr. Kops.*

For the respondent the cause was argued by *Charles D. Hoornstra,* assistant attorney general, with whom on the brief was *Victor A. Miller,* attorney general.

For the intervenor-respondent there was a brief by *Robert C. Kelly* and *Kelly & Haus,* all of Madison, and oral argument by *Robert C. Kelly.*

A brief amicus curiae was filed by *Rex H. Reed* and *James Newton Wilhoit, III,* of Washington, D. C., and *Joseph A. Melli, James K. Ruhly* and *Melli, Shiels, Walker & Pease, S. C.,* all of Madison, for the National Right to Work Legal Defense Foundation.

For the appellants there was a brief by *Henry A. Gempeler,* city attorney, and *Gerald C. Kops,* deputy city attorney.

For the respondent and intervenor-respondent there was a joint brief by *Bronson C. La Follette,* attorney general, and *Charles D. Hoornstra,* assistant attorney general, *Robert C. Kelly* and *Kelly & Haus* of Madison.

DAY, J. The question on this appeal is, was it error for the circuit court to affirm the conclusion of the Wisconsin Employment Relations Commission that the school board committed a prohibited labor practice in that it "negotiated" or "bargained" with other than the exclusive bargaining representative of the teachers on matters subject to collective bargaining when it allowed a representative of a minority group of teachers to speak at a board meeting, listened to his statements and received the results of a petition circulated by that group—all concerning matters subject to collective bar-

gaining—when this was done at a regular public meeting of the board?

The appellant City of Madison Joint School District No. 8, including the city of Madison, villages of Maple Bluff and Shorewood Hills, towns of Madison, Blooming Grove, Fitchburg and Burke (hereinafter "school district") operates the school system of said municipalities; the appellant Board of Education of the district is an agent of the district and is charged with the possession, care, control and management of the property and affairs of the school district.

The respondent Wisconsin Employment Relations Commission (hereinafter "WERC") is an administrative body charged with the responsibility of administering statutory policy with respect to both public and private employees.

Madison Teachers, Incorporated (hereinafter "MTI"), intervenor-respondent, is a labor organization which was, at the time of the events which give rise to this action, the exclusive majority collective bargaining representative of the teachers of the district.

The Board of Education (board) and MTI were, for the calendar year 1971, parties to a collective bargaining agreement covering wages, hours, and conditions of employment for all bargaining unit personnel, which included all teachers. The agreement terminated on December 31, 1971. Negotiations for a successor agreement began almost as soon as the previous one concluded. Thus, on January 25, 1971, MTI submitted a proposal for a new contract to take effect January 1, 1972. This proposal contained a "fair-share" provision, a contractual requirement that all teachers, including those not then members, pay full union dues, i.e., their "fair share" of the costs of collective bargaining.

Such a provision was proposed by MTI the previous year and was rejected by the board. This fair-share provision was discussed throughout the 1971 negotia-

tions and at all times was opposed by the board. Initially, the board objected because such a provision was then illegal. There were frequent requests by the board for MTI to defer fair share for another year.

On November 11, 1971, legislation (ch. 124, Laws of 1971) became effective which allowed inclusion of a fair-share provision in municipal employee collective bargaining agreements. This is now codified as sec. 111.70 (1), Stats., and defined in sec. 111.70 (1) (h). Soon thereafter MTI submitted another fair-share proposal to conform to the new law; again it was rejected by the board.

The number of unresolved issues between the parties had been reduced to about 13 by November, 1971. Two of these were considered of overriding importance by both sides: (1) The fair-share provision, and (2) the provision for binding arbitration of nonrenewal of teacher contracts and teacher dismissals. The board had opposed both of these issues throughout the negotiations. However, in late October or early November, the chairman of the board's negotiating team indicated, informally and unofficially, to the chairman of MTI's negotiating team that there was "no way" arbitration for dismissals and nonrenewals would be accepted by the board, but there was a "distinct possibility" the fair-share provision could be accepted. He said two members of the board said they would approve fair share if MTI would withdraw its arbitration proposal.

On the other hand, at the WERC hearing in this case, the chairman of MTI's negotiating team testified that the union's bargaining strategy was to lead the board to believe that MTI's primary interest was in fair share when in fact it was in arbitration. If this strategem were successful, MTI could at some point offer to "sacrifice" fair share for arbitration and celebrate the result.

On November 14, 1971, Ralph Reed and Albert Holmquist, teachers employed by the district, neither of whom were members of MTI, sent a letter opposing the fair-

share provision, which they considered a denial of freedom of choice, to all teachers employed by the district. The letter solicited responses and 200 were received, the majority sympathetic to their position. A meeting of some of these teachers was scheduled for December 2, 1971. Fourteen teachers attended, half of whom were MTI members. They prepared a petition and formulated plans for circulating it in the schools on December 6, 1971. The petition supported a one-year deferral of consideration of fair share. It was intended to present the results of the petition to both MTI and the board at the board's regular public meeting on the evening of December 6, 1971. The petition was circulated in the schools, in nonworking areas on nonworking time, that day and a letter, also urging deferral of fair share, was distributed to the teachers of two schools through their school mailboxes. The principals of those two schools, agents of the board, knew of the latter activity.

By December 6, 1971, negotiations between the board and MTI had reached an impasse. For the board's regular public meeting that evening MTI had arranged to have pickets present and 300–400 teachers in attendance at the auditorium. MTI's representative John Mathews knew in advance that Messrs. Reed and Holmquist intended to present the results of their petition and speak to the board against fair share. He encountered Mr. Holmquist and Mr. Reed in the auditorium before the meeting was to begin and tried to talk them out of presenting the petition or speaking to the board.

Soon thereafter, Mr. Mathews met a member of the board, Mr. Yelinek, outside. He informed Mr. Yelinek of what Messrs. Reed and Holmquist intended to do that evening and also showed him underlined portions of the *Board of School Directors of Milwaukee v. WERC* (1969), 42 Wis. 2d 637, 168 N. W. 2d 92. Mr. Yelinek responded that he "would take care of it."

Mr. Mathews met Messrs. Reed and Holmquist again, soon after talking with Mr. Yelinek. He again tried, un-

successfully, to talk them out of presenting the petition and speaking to the board, telling them that the negotiations were delicate and urging them to refrain "or we were going to lose the whole ball game."

At the board meeting, a portion of time was devoted to public appearances. Mr. Holmquist completed a registration form stating that he wished to speak during this period. He did not say on this form what he wished to speak about. Several individuals spoke during this time and then the president of MTI rose and spoke. At the conclusion of his remarks he presented to the board a statement signed by 1300 to 1400 teachers, declaring "We, the undersigned wish the parties to resume negotiations and reach agreement as quickly as possible."

Immediately following this speaker, Mr. Holmquist was allowed to speak. He said:

"My name is Albert Holmquist. I reside at 5626 Crestwood Place. I am another teacher. I represent an informal committee of 72 teachers in 49 schools. I would like to inform the Madison Board of Education, as I already have the Madison Teachers, Incorporated, about the results of an informational survey regarding one of the thirteen or so items now on the conference table and one of the main items that will certainly be included in some form in the new package."

He then read the petition:

"To: Madison Board of Education, Madison Teachers, Incorporated. We the undersigned ask that the fair-share proposal (agency shop) being negotiated by Madison Teachers, Incorporated and the Madison Board of Education be deferred this year. We propose the following: (1) The fair-share concept being negotiated be thoroughly studied by an impartial committee composed of representatives from all concerned groups. (2) The findings of this study be made public. (3) This impartial committee will ballot (written) all persons affected by the contract agreement for their opinion on the fair-share proposal. (4) The results of this written ballot be made public."

He added:

"We feel this study necessary because neither the board's negotiators who have placed entirely too much emphasis on this one point nor Madison Teachers, Inc., which speaks euphemistically about the (whole package) and therefore is not issue specific . . . Neither has properly addressed the serious issue of fair-share and agency shop. We find much confusion in the proposal as it stands and even more on the part of teachers' interpretations of it.

"For evidence, 417 teachers from the 31 schools which represents 53% of the total number of these faculties of these schools . . . who have called in to this hour have signed the petition on the first day it was taken into their schools. Due to this confusion, we wish to take no stand on the proposal itself, but ask only that all alternatives be presented clearly to all teachers and more importantly to the general public to whom we are all responsible. We ask simply for communication, not confrontation."

When he finished, the board president asked Mr. Holmquist whether he intended to communicate the petitions to the board. Mr. Holmquist replied that he did; the petitions, however, were never presented to the board. There was no other exchange between Mr. Holmquist and any member of the board.

After the public meeting, the board went into executive session and considered the unresolved collective bargaining issues, since a negotiation session had been scheduled for the following day, December 7, 1971. The board adopted the following resolution:

" 'It was moved and seconded to accept the total package as presented including arbitration for dismissal of non-probationary teachers and *not* including agency shop; if the MTI does not accept this as a total package, the offer of arbitration is withdrawn.' " (Emphasis, the board's.)

At the next day's negotiations, the board's representatives opened the meeting with the above-quoted resolution and said, ". . . This is the deal." After some discussion, MTI conceded and tentative agreement was reached. The final agreement was signed December 14,

1971, with no fair-share provision, but with the arbitration provision.

In January, 1972, MTI filed a complaint with WERC alleging that the board committed a prohibited labor practice when it listened to Mr. Holmquist at its public meeting; this was said to constitute prohibited negotiating with other than the official, exclusive collective bargaining representative, MTI. The board denied the charge. A hearing was held on February 28, 1972. On September 13, 1972, WERC concluded that the board had committed the alleged prohibited labor practices and ordered the board to cease and desist from the same.

The board petitioned the Dane county circuit court for review under ch. 227, Stats. MTI intervened. On October 2, 1973, the court entered its written decision affirming the WERC conclusion and order. Judgment affirming WERC and dismissing the petition for review was entered October 17, 1973. The board appeals from that judgment.

The basic question on the appeal is: Did the board commit an unfair labor practice under the fact situation outlined above? In addition, other questions have been raised on issues of constitutionality and statutory construction.

It could be argued that as a matter of policy the board should hear not only the majority union, but any minority union groups or *ad hoc* committee representatives to thereby get a cross-section of all views and ascertain what all employees think of the various issues subject to collective bargaining. Under such an argument the board and its bargaining representatives should listen to and exchange ideas with all these various groups and factions within a collective bargaining unit. But that is not how collective bargaining is to be carried out under our law.

This court has held that the majority organization in a particular labor bargaining unit is, under the Municipal

Employment Relations Act (MERA), sec. 111.70, Stats., not only the bargaining representative for the members of that majority organization, but is the exclusive bargaining representative of all the employees, members or nonmembers, of the bargaining unit. *Board of School Directors of Milwaukee v. WERC, supra,* at 645–647. *Accord, Board of Education v. WERC* (1971), 52 Wis. 2d 625, 191 N. W. 2d 242. The statute also states that it is a prohibited labor practice for a municipal employer to refuse to bargain collectively with this exclusive majority representative. Sec. 111.70 (3) (a) 4. Further, it is a prohibited labor practice for the municipal employer "To interfere with, restrain or coerce municipal employes in the exercise of their rights . . ." sec. 111.70 (3) (a) 1, one of which is the right ". . . to bargain collectively through representatives of their own choosing . . ." sec. 111.70 (2). In this case, WERC concluded that the board, in allowing Mr. Holmquist to speak and in listening to his statement and his oral presentation of the results of his petition, had committed prohibited labor practices in violation of sec. 111.70 (3) (a) 1 and 4, in that it had violated its duty to bargain in good faith with MTI and had interfered with the rights of employees represented by MTI to bargain collectively through representatives of their own choosing. On this basis, WERC ordered, *inter alia,* that the board:

"1. Shall immediately cease and desist from permitting employes, other than representatives of Madison Teachers, Inc., to appear and speak at meetings of the Board of Education, on matters subject to collective bargaining between it and Madison Teachers, Inc."

The WERC decision was affirmed by the circuit court.

The basic question here is whether or not the activities of the board at its public meeting constituted bargaining. The board of education in its brief concedes that bargaining by a minority group of employees with the

board is prohibited by our law. In its brief the board states:

"... It may well be because of the public interest in stable labor relations permissible to restrict the rights of a minority group or individual teacher to negotiate with their employer. However, we submit to prevent an employee from providing information to his employer orally is beyond the scope of permissible restriction of the Constitutional rights of public employees to speak and petition their government. ...

"The Board of Education does not contest the assertion that it has an obligation to bargain exclusively with the majority representative of its employees or that a 'fair-share' agreement is a matter of mandatory bargaining."

The United States[1] and Wisconsin[2] Constitutions protect the rights of individuals to speak and to petition their federal and state governments. But it is well established

---

[1] The first and fourteenth amendments to the United States Constitution, in pertinent part, are:

"ARTICLE I.

"Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

"ARTICLE XIV.

"... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2] The Wisconsin Constitution provides, in pertinent part, in art. I, secs. 3 and 4:

"**Free speech; libel.** SECTION 3. Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech ...."

"**Right to assemble and petition.** SECTION 4. The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

that these freedoms are not absolute.[3] To the extent that the WERC and circuit court decisions in this case infringe upon the freedom to speak and to petition the federal and state governments, they are within the limits imposed on the restriction of those rights by United States Supreme Court decisions and the decisions of this court. What is required to overcome the constitutional proscriptions on abridgement of these rights has been variously described as ". . . a clear and present danger that [the speech] will bring about the substantive evils that [the legislature] has a right to prevent," *Schenck v. United States* (1919), 249 U. S. 47, 52, 39 Sup. Ct. 247, 63 L. Ed. 470, or ". . . grave and immediate danger to interests which the State may lawfully protect," *Board of Education v. Barnette* (1943), 319 U. S. 624, 639, 63 Sup. Ct. 1178, 87 L. Ed. 1628. Somewhat more recently the court has refined this language into a balancing test:

" 'In each case [courts] must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " *Dennis v. United States* (1951), 341 U. S. 494, 510, 71 Sup. Ct. 857, 95 L. Ed. 1137.

This question has been answered by this court and the United States Supreme Court in the field of labor negotiations. In *Board of School Directors of Milwaukee v. WERC, supra,* this court recognized the right of the certified majority union to exclusive negotiating rights with the employer. *Accord, Board of Education v. WERC* (1971), 52 Wis. 2d 625, 633, 191 N. W. 2d 242. The principle of exclusivity, by definition, forbids certain

[3] *State v. Becker* (1971), 51 Wis. 2d 659, 664, 188 N. W. 2d 449; *State ex rel. Gall v. Wittig* (1969), 42 Wis. 2d 595, 606, 167 N. W. 2d 577; *State v. Zwicker* (1969), 41 Wis. 2d 497, 509, 510, 164 N. W. 2d 512; *State v. Givens* (1965), 28 Wis. 2d 109, 118, 135 N. W. 2d 780.

individuals from speaking certain things in certain contexts; the first amendment rights of those persons are, to that extent, thereby infringed. But the gravity of that evil was considered outweighed by the necessity to avoid the dangers attendant upon relative chaos in labor management relations.

"The federal labor laws seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining. . . . The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." *Vaca v. Sipes* (1967), 386 U. S. 171, 182, 87 Sup. Ct. 903, 17 L. Ed. 2d 842; *cf., Medo Corp. v. Labor Board* (1944), 321 U. S. 678, 684, 64 Sup. Ct. 830, 88 L. Ed. 1007; *accord, Texaco, Inc. v. NLRB* (7th Cir. 1971), 436 Fed. 2d 520, 524.

The question of whether speech in the form of bargaining or negotiating for a labor agreement can be constitutionally restricted to representatives of the majority bargaining unit has been answered in the affirmative. None of the parties to this action disputes that. Now the question is whether the activity herein complained of by MTI, and subsequently proscribed by WERC, qualifies as bargaining and can, therefore, be restricted under the rule of *Board of School Directors of Milwaukee v. WERC, supra.* In that case, Mr. Justice HANLEY speaking for a majority of this court defined "negotiating" as follows, page 652:

"Quite obviously, the determination of this issue turns on the interpretation given to 'negotiating.'

" 'Negotiate' is defined in Webster's New International Dictionary (3d ed.) as:

" '. . . 1: to communicate or confer with another so as to arrive at the settlement of some matter: meet with another so as to arrive through discussion at some kind of agreement or compromise about something: come to

terms esp. in state matters by meetings and discussions . . . .' ''

In that case, the school board and the majority union were in the midst of negotiations on a new contract. At a public meeting of one of the committees of the school board, a representative of the minority union rose to speak on a matter which was a subject of negotiations. He was denied the right to speak. WERC considered this denial a prohibited practice. The circuit court reversed the WERC decision and was affirmed by this court; this court finding, in effect, that allowing the minority representative to speak on that subject would have constituted prohibited negotiating or bargaining with him. This court had to determine the interpretation to be given to "negotiating" and relied on the definition cited above. This court placed emphasis on the statutory requirement that no final action should be taken on such negotiated matters until they are made public and discussed in an open public meeting.[4] The court said that such ". . . open meeting is the necessary and final step in the 'negotiation' process between the school board and the majority teachers' union." *Board of School Directors of Milwaukee v. WERC, supra,* at page 653. Thus, it seems the court considered the school board committee meeting in that case to be a part of the "negotiation process." With the impasse that had been reached in the negotiations in the case before us with the majority union, with several members present at the board meeting, with its pickets present, and its representatives addressing the board on subjects of the collective bargaining negotiations, that meeting certainly

---

[4] " '. . . the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental affairs and the transaction of governmental business.' " Sec. 14.90 (1), Stats. 1967, renumbered as sec. 66.77 (1), Stats. 1973. *See: Board of School Directors of Milwaukee v. WERC, supra,* at page 650.

was part of the negotiation process. The board relies heavily on the statement made by this court in that case, in which this court said (p. 652) :

"If this case involved solely the giving of a position statement at an ordinary meeting of a public body, we would have some difficulty in labeling the conduct 'negotiating.' "

What was said in the case before us goes beyond the mere giving of a "position statement" because here the statement went to the very heart of the negotiations.

As the trial court in this case pointed out in its analysis of the facts :

"In November, 1971, a Mr. Holmquist and a Mr. Reed, both of whom are teachers employed by the school board and both of whom are not members of MTI, drafted a letter addressed to 'Dear Fellow Madisonian Educator.' Such letter, headed 'E.C.—O.L.O.G.Y.,' meaning 'Educator's Choice—Obligatory Leadership Or Governance by You,' asked the addressee to 'Save Freedom of Choice' and stated that 'A Closed Shop (agency shop) Removes This Freedom.' The bottom portion of such letter was in the form of a ballot allowing the addressee to express his opposition to 'agency shop.' Said letter was mailed on November 14, 1971, to all teachers in the Madison Public School system by Holmquist and Reed. Approximately two hundred replies to such letter were received, the majority of which were favorable to their position on fair share. . . .

"Mr. Holmquist appeared at the board meeting held on December 6, 1971, and he was permitted to speak to the board. . . .

"Even though Holmquist's statement superficially appears to be merely a 'position statement,' the court deems from the total circumstances that it constituted 'negotiating.' The court in *Board of School Directors, supra,* at page 653 stated :

" 'On the other hand, if the minority union representative is permitted to influence the decision of the school board by his argument, then he is truly "negotiating." '

"In the case at bar, Holmquist in fact desired to have the fair-share proposal deleted from the agreement. . . ."

We agree with the trial court that this was in fact negotiating and one need only read the Holmquist statement to see that the "information" that was being imparted was a request that the whole fair-share issue be deferred along with a counter proposal as to how the issue should be handled for possible future consideration. It also criticized MTI's handling of the negotiations in this respect.

The statement given by Mr. Holmquist was more than a mere statement of a position; it was an argument for it. Furthermore, though Mr. Holmquist was not speaking for a minority union, as in the case of *Board of School Directors of Milwaukee,* it is obvious he was speaking for an *ad hoc* group which was opposed to including a fair-share agreement in any contract being negotiated at that time.

The board also argues that the WERC order must be invalidated because it is vague; it fails to provide adequate guidelines for compliance with its terms. The WERC order directs the board to cease and desist from permitting employees, other than the representatives of MTI, from appearing and speaking at meetings of the board on matters subject to collective bargaining. Matters subject to collective bargaining, as opposed to subjects reserved to management, are defined as "wages, hours and conditions of employment." Sec. 111.70 (1) (d), Stats. The board argues that "conditions of employment" is constitutionally vague and, thus, the order must be voided.

The board, however, has no standing to raise the question. It has conceded in its brief and at oral argument that the matter spoken of by Mr. Holmquist before the board was a subject of collective bargaining. Thus, whatever the vagaries of the WERC order as it may or may not affect others, it is both a plain fact and conceded by the board that there is no vagueness in that order as it affects the board's conduct here.

". . . even if the outermost boundaries of [the prohibition] may be imprecise, any such uncertainty has little relevance here, where appellants' conduct falls squarely within the 'hard core' of the . . . proscriptions . . . ." *Broadrick v. Oklahoma* (1973), 413 U. S. 601, 608, 93 Sup. Ct. 2908, 37 L. Ed. 2d 830. *Accord, Paulos v. Breier* (7th Cir. 1974), 507 Fed. 2d 1383, 1387, 1388; *Driscoll v. Schmidt* (D. C. Wis. 1973), 354 Fed. Supp. 1225, 1229.

The law is clear that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy* (1974), 417 U. S. 733, 756, 94 Sup. Ct. 2547, 41 L. Ed. 2d 439. The board has no standing to raise the vagueness claim.

Furthermore, "wages, hours and conditions of employment" is the phrase commonly used to describe what are subjects of collective bargaining. It is used in the NLRA, 29 U. S. Code, secs. 152 (9) and 159 (a). Certainly, "[w]ords inevitably contain germs of uncertainty. . . ." *Broadrick v. Oklahoma, supra,* at page 608, but the test to avoid unconstitutional vagueness does not require crystal clarity:

"There might be quibbles about the meaning of [certain language] ; but there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *Civil Service Commission v. Letter Carriers* (1973), 413 U. S. 548, 577–579, 93 Sup. Ct. 2880, 37 L. Ed. 2d 796. *See also: Weber v. State* (1973), 59 Wis. 2d 371, 382, 208 N. W. 2d 396.

We conclude the order of the Wisconsin Employment Relations Commission of September 13, 1972, is not vague.

*By the Court.*—Judgment affirmed.

ROBERT W. HANSEN, J. *(dissenting)*. What is wrong with holding that only the spokesman for the designated bargaining agent of the teachers may speak on employment-related school matters at a public meeting of a public school board? What is wrong is that it denies the constitutional assurances as to freedom of speech and petition to individual school teachers and other teacher groups.

The first amendment to the United States Constitution guarantees that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[1] The Wisconsin Constitution assures the right of every person to ". . . freely speak, write and publish his sentiments on all subjects . . ." and to ". . . petition the government or any department thereof . . . ."[2] The United States Supreme Court has made clear that as a constitutional matter teachers may not be ". . . compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work . . . ."[3] These constitutional guarantees protect

[1] Amendments to the United States Constitution, art. I, made applicable to states by the "due process" clause of the fourteenth amendment. *See: Joseph Burstyn, Inc. v. Wilson* (1952), 343 U. S. 495, 72 Sup. Ct. 777, 96 L. Ed. 1098. *See also: Lawson v. Housing Authority* (1955), 270 Wis. 269, 70 N. W. 2d 605, recognizing such applicability.

[2] Wisconsin Constitution, art. I, sec. 3, providing: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. . . ." And, art. I, sec. 4, providing: "The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

[3] *Pickering v. Board of Education* (1968), 391 U. S. 563, 568, 88 Sup. Ct. 1731, 20 L. Ed. 2d 811.

all citizens, public school teachers included, with the nature of the teaching profession bringing ". . . the safeguards of those amendments vividly into operation."[4]

We deal here with the right of a teacher to speak at a public meeting of a school board on school matters— during the portion of such meeting set aside for appearances by the general public.[5] During such citizens-invited-to-present-points-of-view part of the meeting, the president of the teachers' association, that was the sole collective bargaining agent, spoke for a fair-share proposal,[6] and presented a petition or statement signed by between 1,300 and 1,400 teachers urging continued negotiations and early agreement. Then an individual teacher requested permission to speak, without indicating what he intended to talk about. Given such permission, he stated that he represented ". . . an in-

---

[4] See: Wieman v. Updegraff (1952), 344 U. S. 183, 73 Sup. Ct. 215, 97 L. Ed. 216, Mr. Justice FRANKFURTER in concurring opinion (page 195) stating: "By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers affects not only those who, like the appellants, are immediately before the Court. It has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice . . . ."

[5] The meeting involved was the regular and scheduled meeting of the board of education of the City of Madison, Joint School District No. 8, on the evening of December 6, 1971. A portion of each regular meeting of this board is opened and devoted to appearances by the public, permitting concerned citizens to present their points of view on school matters to the board.

[6] Sec. 111.70 (2), Stats., provides the procedure by which a union security agreement designated "fair share" may be established or terminated.

formal committee of 72 teachers in 49 schools," urged further study of the fair-share proposal and stated he would submit a petition signed by teachers who favored delay for study. The school board permitted both the association president and the committee spokesman to speak and listened to both when they spoke.

The state employment relations board found that the Madison school board, by listening to the teacher who spoke after the president of the teachers' association had concluded his remarks, had committed a "prohibited practice" in violation of sec. 111.70 (3) (a) 1 and 4, Stats.[7] The employment relations board ordered the school board to ". . . immediately cease and desist from permitting employes, other than representatives of Madison Teachers, Inc., to appear and speak at meetings of the Board of Education, on matters subject to collective bargaining . . . ." The circuit court upheld such order, and the majority of our court affirms.

The writer sees three constitutional infirmities in the employment relations board's order, all related to the first amendment and the corollary state constitutional guarantees as to freedom of speech and right to petition for redress of grievances.

*The right to speak.* When a school board sets aside a portion of its regular meeting as a public forum where citizens generally may state their views on school matters, the invitation and the right to appear go to all citizens, teachers included. The school board is a public

---

[7] Sec. 111.70 (3) (a) 1, Stats., provides that it is a prohibited practice for a municipal employer ". . . 1 to interfere with, restrain or coerce municipal employes in the exercise of their rights guaranteed in sub. (2)." Subdivision 2 provides that it is a prohibited practice ". . . 2 To initiate, create, dominate or interfere with the formation or administration of any labor or employe organization. . . ." Subdivision 4 provides that it is a prohibited practice ". . . 4 To refuse to bargain collectively with a representative of a majority of its employes in an appropriate collective bargaining unit. . . ."

body. The meetings are public meetings. Its open discussion periods are just that—open to the public, teachers included. The majority opinion finds the exclusion of teachers or teacher groups, other than the one designated as collective bargaining agent, was here justified and required by the state Municipal Employment Relations Act, which provides for an exclusive bargaining representative for an appropriate bargaining unit.[8] As to an individual's right to speak at a public hearing or a public meeting of a public body, we would see any duties or rights deriving from the Municipal Employment Relations Act as limited by rights granted by our constitutions, federal and state. If there is a crunch, it is the statute, not the constitutional right, that must yield. However, in the situation before us, the writer sees no crunch or conflict. The association or union, selected as the bargaining agent for the employees, is the sole bargaining representative of the employees in bargaining sessions between employer and such bargaining agent. These meetings are not public. What the group, selected as sole bargaining agent in the election to select such representative, won was the right to represent the employees in the bargaining unit in bargaining sessions and negotiations with the employer. What it did not win was the right to speak, during a public discussion period, at a public meeting of a public body, with all other voices of individual teachers or groups of teachers to be silenced. The school board here is not required to conduct public discussion periods at its meetings while collective bargaining is going on. It is not required, the writer thinks, to hear any discussion of stated and specified topics or issues that are involved in the collective bargaining negotiations between it and the designated collective bargaining agent. But what it

[8] Subch. IV, secs. 111.70 to 111.77, Stats., the Municipal Employment Relations Act.

cannot do, much less be required to do, is to permit the representative of the employees for bargaining purposes to speak at a public meeting while a gag is placed over the mouths of all individual teachers or other teacher group representatives. This sauce of right to speak at a public meeting cannot be served to one, without being available to the others. It is true that, as to the right of a minority union to speak at a committee meeting dealing with matters involved in collective bargaining negotiations, this court did deny the right of minority unions to be heard at such meeting.[9] However, in that case, our court held: "If this case involved solely the giving of a position statement at an ordinary meeting of a public body, we would have some difficulty in labeling the conduct 'negotiating'."[10] In the case now before us we do have ". . . solely the giving of a position statement at an ordinary meeting of a public body."[11] Restrictions as to length, relevancy or to "giving of a position statement" raise no constitutional questions. They are all implicit in an invitation to appear at a public discussion at a public meeting of a public board. The writer has no quarrel with the Milwaukee case, as limited. However, the writer sees the exclusivity of bargaining representation in employer-employee relations as not here reaching or including the right of the designated representative to speak at a public forum

---

[9] *Board of School Directors of Milwaukee v. WERC* (1969), 42 Wis. 2d 637, 168 N. W. 2d 92. *See also: Board of Education v. WERC* (1971), 52 Wis. 2d 625, 191 N .W. 2d 242.

[10] *Id.* at page 652.

[11] The teacher whose right to speak is here challenged also stated that he intended to present a petition signed by teachers in the school system. However, the order of the employment relations board holds only that permitting the teacher to speak exceeded the bounds of permissible conduct, apparently conceding that sec. 111.70 (2), Stats., authorizes and requires a municipal employer to receive a petition of employees as to a fair-share agreement.

portion of a school board meeting, with all other teacher voices to be silenced. Actually, the employment relations board order does not deny the right of the individual teacher to speak. It only denies the right of the school board to listen. But the right to speak with no one to listen is hardly what the constitutional guarantees envision or protect. The writer, under these circumstances, sees the right of the teacher to speak and the school board to listen as alike constitutionally protected.

*Censorship of content.* As to the brief presentation here made by the individual teacher and spokesman for the informal teachers' committee, the majority finds it to have been ". . . more than a mere statement of a position; it was an argument for it." Unless a speaker takes a firm stand on both sides of the fence, it is difficult to see where a statement of position would not be for or against a proposal or proposition. Here the teacher who spoke identified himself and then read the text of the petition being circulated which he stated would be filed with the board. The petition asked study by an impartial committee. If this was argumentative, it was only mildly so. But the issue as to content of what was or might be said goes deeper. The majority defends the employment relations board order against the charge of vagueness. It finds no vagueness in the board order as it affects ". . . the board's conduct here." That is certainly true, but, in the first amendment context, the question of scope or uncertainty as to future application goes to the chilling effect of the order upon the right of free speech. The employment relations board concluded that, when a teacher asks to speak to the board during a public discussion period at a regular board meeting, the board must inquire as to the nature of the speech. Then, if the topic is a matter subject to collective bargaining, the board must refuse to allow the

teacher to speak. What matters are subject to collective bargaining? The statute provides that a municipal employer must bargain in good faith on matters of wages, hours and working conditions.[12] As appellant suggests, certain questions arise. Suppose the teacher wishes to speak on class size or teachers' aids, the establishment of summer programs, school reading projects, in-service training, or the special treatment and handling of problem students. Are these matters subject to collective bargaining on which the board is restricted from receiving information from teachers other than the majority representative of its employees? Nothing in the Municipal Employment Relations Act suggests that a teacher does not have a right to speak at a public meeting on these matters, yet all could be covered or affected by a collective bargaining agreement. It is in this sense that the department order is vague, not meaning that it cannot be understood and applied by this school board to the facts here, but because the difficulty of locating its outer limits will have a chilling effect both on the right of teachers to speak and school boards to listen on topics, arguably relatable to bargaining, but directly concerned with the well-being of school children and the community. The prudent school board would resolve doubts against the right of an individual teacher to speak on marginal or in-doubt topics, and that is what is meant by having a chilling effect. The writer would hold the order, in its scope and breadth, to have a constitutionally impermissible temperature-lowering effect on the exercise of first amendment rights.

---

[12] Sec. 111.70 (1) (d), Stats., provides: " 'Collective bargaining' means the performance of the mutual obligation of a municipal employer, through its officers and agents, and the representatives of its employes, to meet and confer at reasonable times, in good faith, *with respect to wages, hours and conditions of employment* . . . ." (Emphasis supplied.)

*Justification for infringement.* The majority opinion
sets forth the federal and state constitutional guarantees
of the rights of individuals to speak and to petition
government for redress of grievances. It then concedes
that the WERC and circuit court decisions in this case
infringe upon the freedom to speak and to petition the
federal and state governments. Such infringement of a
constitutional right, the majority writes and the writer
agrees, may be permitted where there is a ". . . grave
and immediate danger to interests which the State may
lawfully protect."[13] The question is whether the gravity
of the dangers justifies the admitted infringement.[14]
In the case before us, the majority holds, the gravity of
infringing upon two rights, assured by federal and state
constitutions, is ". . . considered outweighed by the
necessity to avoid the dangers attendant upon relative
chaos in labor-management relations." The employment
relations board was more restrained, seeing two "salutary
purposes" served by its order—*i.e.*, it "stabilizes the
bargaining relations" and it serves the "unity of collective
clout" which "advances the welfare of public employes."
How can either statement of the public purpose served
withstand the obvious fact that the danger alluded to
could be entirely avoided by permitting no discussion at
a public appearance portion of a regular school board
meeting—by anybody—of specified topics and areas of
discussion, announced and stated in advance of the public
meeting. That would avoid treating a public meeting of
a public body both as a collective bargaining session and
as an opportunity for presentation of points of view by
members of the public with only individual teachers
silenced and not permitted to speak. Even if this

[13] *Board of Education v. Barnette* (1943), 319 U. S. 624, 639,
63 Sup. Ct. 1178, 87 L. Ed. 1628. (Quoted in majority opinion.)
[14] *Dennis v. United States* (1951), 341 U. S. 494, 510, 71 Sup.
Ct. 857, 95 L. Ed. 1137. (Quoted in majority opinion.)

individual teacher, speaking for himself or for his informal committee, were permitted to state his or their position during a public discussion period at a regular school board meeting, could grave danger, much less "chaos," be a likely or reasonably predictable result? This is no "shouting 'Fire' in a crowded theater" situation. Any conflict between exclusivity in bargaining and the teachers' rights of free speech can be here entirely avoided by advance listing of topics that no one may discuss during the public-invited period of the school board meeting. The writer sees no reason here for holding that anyone except an individual school teacher or minority teacher group may speak freely on school affairs at a school board meeting. Town-meeting type discussions at school board meetings are in the American tradition, but town meetings were open to everyone, not everyone except school teachers. Freedom of speech ". . . lies at the foundation of a free society,"[15] and ". . . speech concerning public affairs is more than self-expression; it is the essence of self-government."[16] The writer would reverse. As to teacher participation in a public discussion at a public meeting of a public body, the writer finds here no showing of facts present or danger threatened that either requires or warrants denying this teacher and any other teacher so situated, ". . . the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work. . . ."[17]

I am authorized to state that Mr. Justice BRUCE F. BEILFUSS and Mr. Justice CONNOR T. HANSEN join in this dissent.

[15] *Shelton v. Tucker* (1960), 364 U. S. 479, 486, 81 Sup. Ct. 247, 5 L. Ed. 2d 231.

[16] *Garrison v. Louisiana* (1964), 379 U. S. 64, 74, 75, 85 Sup. Ct. 209, 13 L. Ed. 2d 125.

[17] *Pickering v. Board of Education, supra,* footnote 3, at page 568.