CITY OF MADISON JOINT SCHOOL DISTRICT NO. 8
ET AL. *v.* WISCONSIN EMPLOYMENT
RELATIONS COMMISSION ET AL.

No. 75–946.  Argued October 12, 1976—Decided December 8, 1976

*Gerald C. Kops* argued the cause for appellants. With him on the briefs was *Henry A. Gempeler*.

*Robert C. Kelly* argued the cause for appellee Madison Teachers, Inc. With him on the brief was *William Haus*.*

---

*Briefs of *amici curiae* urging reversal were filed by *William W. Van Alstyne* for the American Association of University Professors; by *Robert T. Thompson* and *Lawrence Kraus* for the Chamber of Commerce of the United States; by *James Newton Wilhoit III, Rex H. Reed,* and *James K. Ruhly* for the National Right to Work Legal Defense Foundation; by *Sylvester Petro* for the Public Service Research Council; by *John J. Gunther* for the United States Conference of Mayors; and by *James F. Clark* and *Karen A. Mercer* for the Wisconsin Association of School Boards, Inc.

Briefs of *amici curiae* were filed by *J. Albert Woll* and *Laurence Gold*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented on this appeal from the Supreme Court of Wisconsin is whether a State may constitutionally require that an elected board of education prohibit teachers, other than union representatives, to speak at open meetings, at which public participation is permitted, if such speech is addressed to the subject of pending collective-bargaining negotiations.

The Madison Board of Education and Madison Teachers, Inc. (MTI), a labor union, were parties to a collective-bargaining agreement during the calendar year of 1971.[1] In January 1971 negotiations commenced for renewal of the agreement and MTI submitted a number of proposals. One among them called for the inclusion of a so-called "fair-share" clause, which would require all teachers, whether members of MTI or not, to pay union dues to defray the costs of collective bargaining. Wisconsin law expressly permits inclusion of "fair share" provisions in municipal employee collective-bargaining agreements. Wis. Stat. § 111.70 (2) (1973). Another proposal presented by the union was a provision for binding arbitration of teacher dismissals. Both of these provisions were resisted by the school board. The negotiations deadlocked in November 1971 with a number of issues still unresolved, among them "fair share" and arbitration.

During the same month, two teachers, Holmquist and Reed, who were members of the bargaining unit, but not members of the union, mailed a letter to all teachers in the district

for the American Federation of Labor and Congress of Industrial Organizations, and by *Robert H. Chanin* and *David Rubin* for the National Education Assn.

[1] MTI had been certified on June 7, 1966, as majority collective-bargaining representative of the teachers in the district by the Wisconsin Employment Relations Commission.

expressing opposition to the "fair share" proposal.[2] Two hundred teachers replied, most commenting favorably on Holmquist and Reed's position. Thereupon a petition was drafted calling for a one-year delay in the implementation of "fair share" while the proposal was more closely analyzed by an impartial committee.[3] The petition was circulated

---

[2] The text of the letter was as follows:

"Dear Fellow Madisonian Educator,
          "E. C. — O. L. O. G. Y.
     "*Educator's Choice—Obligatory Leadership Or Gover[n]ance by You*
               "SAVE FREEDOM OF CHOICE
          "A Closed Shop (agency shop) Removes This Freedom
"1. Does an organization which represents the best interests of teachers and pupils NEED mandatory membership deductions?
"2. Need relationships between administrators and teachers be further strained by LEGALLY providing for mandatory adversary camps?
"3. Should minority voices be mandatorily SILENCED?
"4. Could elimination of outside dissent produce NON-RESPONSIVE-NESS to change?
"5. And . . .
     isn't this lack of FREEDOM OF CHOICE undemocratic?
          *"SUPPORT FREEDOM OF CHOICE—*
               *OPPOSE AGENCY SHOP*
"I wish to maintain freedom of choice:
  "I oppose agency shop on principle                              _____
  "I oppose agency shop and would sign
   a petition stating so                                         _____
  "I oppose agency shop and would work
   actively to maintain freedom of choice                       _____
"Let us hear from YOU.
  "Al Holmquist /s/          E. C. — O. L. O. G. Y.
  "Al Holmquist              P. O. Box 5184
  "Ralph Reed /s/            Madison, WI 53705
  "Ralph Reed
     "Teacher co-chairmen"
[3] The text of the petition was as follows:
"To: Madison Board of Education                    December 6, 1971
     Madison Teachers, Incorporated
"We the undersigned ask that the fair-share proposal (agency shop)

to teachers in the district on December 6, 1971. Holmquist and Reed intended to present the results of their petition effort to the school board and to MTI at the school board's public meeting that same evening.

Because of the stalemate in the negotiations, MTI arranged to have pickets present at the school board meeting. In addition, 300 to 400 teachers attended in support of the union's position. During a portion of the meeting devoted to expression of opinion by the public, the president of MTI took the floor and spoke on the subject of the ongoing negotiations. He concluded his remarks by presenting to the board a petition signed by 1,300–1,400 teachers calling for the expeditious resolution of the negotiations. Holmquist was next given the floor, after John Matthews, the business representative of MTI, unsuccessfully attempted to dissuade him from speaking. Matthews had also spoken to a member of the school board before the meeting and requested that the board refuse to permit Holmquist to speak. Holmquist stated that he represented "an informal committee of 72 teachers in 49 schools" and that he desired to inform the board of education, as he had already informed the union, of the results of an informational survey concerning the "fair share" clause. He then read the petition which had been circulated to the teachers in the district that morning and stated that in the 31 schools from which reports had been received, 53% of the teachers had already signed the petition.

being negotiated by Madison Teachers, Incorporated and the Madison Board of Education be deferred this year. We propose the following:

"1) The fair-share concept being negotiated be thoroughly studied by an impartial committee composed of representatives from all concerned groups.

"2) The findings of this study be made public.

"3) This impartial committee will ballot (written) all persons affected by the contract agreement for their opinion on the fair-share proposal.

"4) The results of this written ballot be made public."

Holmquist stated that neither side had adequately addressed the issue of "fair share" and that teachers were confused about the meaning of the proposal. He concluded by saying: "Due to this confusion, we wish to take no stand on the proposal itself, but ask only that all alternatives be presented clearly to all teachers and more importantly to the general public to whom we are all responsible. We ask simply for communication, not confrontation." The sole response from the school board was a question by the president inquiring whether Holmquist intended to present the board with the petition. Holmquist answered that he would. Holmquist's presentation had lasted approximately 2½ minutes.

Later that evening, the board met in executive session and voted a proposal acceding to all of the union's demands with the exception of "fair share." During a negotiating session the following morning, MTI accepted the proposal and a contract was signed on December 14, 1971.

### (1)

In January 1972, MTI filed a complaint with the Wisconsin Employment Relations Commission (WERC) claiming that the board had committed a prohibited labor practice by permitting Holmquist to speak at the December 6 meeting. MTI claimed that in so doing the board had engaged in negotiations with a member of the bargaining unit other than the exclusive collective-bargaining representative, in violation of Wis. Stat. §§ 111.70 (3)(a)1, 4 (1973).[4] Fol-

---

[4] The statute provides in relevant part:

"(3) PROHIBITED PRACTICES AND THEIR PREVENTION. (a) It is a prohibited practice for a municipal employer individually or in concert with others:

"1. To interfere with, restrain or coerce municipal employes in the exercise of their rights guaranteed in sub. (2).

.       .       .       .

"4. To refuse to bargain collectively with a representative of a ma-

lowing a hearing the Commission concluded that the board was guilty of the prohibited labor practice and ordered that it "immediately cease and desist from permitting employes, other than representatives of Madison Teachers Inc., to appear and speak at meetings of the Board of Education, on matters subject to collective bargaining between it and Madison Teachers Inc." The Commission's action was affirmed by the Circuit Court of Dane County.

The Supreme Court of Wisconsin affirmed. 69 Wis. 2d 200, 231 N. W. 2d 206. The court recognized that both the Federal and State Constitutions protect freedom of speech and the right to petition the government, but noted that these rights may be abridged in the face of " 'a clear and present danger that [the speech] will bring about the substantive evils that [the legislature] has a right to prevent.' " *Id.,* at 211, 231 N. W. 2d, at 212, citing *Schenck* v. *United States,* 249 U. S. 47 (1919). The court held that abridgment of the speech in this case was justified in order "to avoid the dangers attendant upon relative chaos in labor management relations." 69 Wis. 2d, at 212, 231 N. W. 2d, at 213.

### (2)

The Wisconsin court perceived "clear and present danger" based upon its conclusion that Holmquist's speech before the school board constituted "negotiation" with the board. Permitting such "negotiation," the court reasoned, would undermine the bargaining exclusivity guaranteed the majority union under Wis. Stat. § 111.70 (3)(a)4 (1973). From that

---

jority of its employes in an appropriate collective bargaining unit. Such refusal shall include action by the employer to issue or seek to obtain contracts, including those provided for by statute, with individuals in the collective bargaining unit while collective bargaining, mediation or fact-finding concerning the terms and conditions of a new collective bargaining agreement is in progress, unless such individual contracts contain express language providing that the contract is subject to amendment by a subsequent collective bargaining agreement."

premise it concluded that teachers' First Amendment rights could be limited. Assuming, *arguendo*, that such a "danger" might in some circumstances justify some limitation of First Amendment rights, we are unable to read this record as presenting such danger as would justify curtailing speech.

The Wisconsin Supreme Court's conclusion that Holmquist's terse statement during the public meeting constituted negotiation with the board was based upon its adoption of the lower court's determination that, " '[e]ven though Holmquist's statement superficially appears to be merely a "position statement," the court deems from the total circumstances that it constituted "negotiating." ' " This cryptic conclusion seems to ignore the ancient wisdom that calling a thing by a name does not make it so.[5] Holmquist did not seek to bargain or offer to enter into any bargain with the board, nor does it appear that he was authorized by any other teachers to enter into any agreement on their behalf. Although his views were not consistent with those of MTI, communicating such views to the employer could not change the fact that MTI alone was authorized to negotiate and to enter into a contract with the board.

Moreover the school board meeting at which Holmquist was permitted to speak was open to the public.[6] He ad-

---

[5] The determination of the state courts that certain conduct constituted "negotiating" under state law, standing alone, would not ordinarily be open to our review; only its use as a predicate for restraining speech opens it to review here.

[6] This meeting was open to the public pursuant to a Wisconsin statute which requires certain governmental decisionmaking bodies to hold open meetings. Wis. Stat. § 66.77 (1) (1973), now § 19.81 (1) (1976). There are exceptions to the statute, and one of these has been interpreted to cover labor negotiations between a municipality and a labor organization. 54 Op. Atty. Gen. of Wis. vi (1965), cited with approval, *Board of School Directors* v. *Wisconsin Employment Relations Comm'n*, 42 Wis. 2d 637, 653, 168 N. W. 2d 92, 99–100 (1969). Thus, in contrast to the open session where the public was invited, the true bargaining sessions between the union and the board were conducted in private.

dressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government. We have held that teachers may not be "compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work." *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968). See also *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Shelton* v. *Tucker,* 364 U. S. 479 (1960); *Wieman* v. *Updegraff,* 344 U. S. 183 (1952). Where the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding teachers who make up the overwhelming proportion of school employees and who are most vitally concerned with the proceedings.[7] It is conceded that any citizen could have presented precisely the same points and provided the board with the same information as did Holmquist.

Regardless of the extent to which true contract negotiations between a public body and its employees may be regulated— an issue we need not consider at this time—the participation in public discussion of public business cannot be confined to one category of interested individuals.[8] To permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis

---

[7] We need not decide whether a municipal corporation as an employer has First Amendment rights to hear the views of its citizens and employees. It is enough that Holmquist and other teachers and citizens have a protected right to communicate with the board. Since the board's ability to hear them is "inextricably meshed" with the teachers' right to speak, the board may assert those rights on behalf of Holmquist. *Procunier* v. *Martinez,* 416 U. S. 396, 409 (1974).

[8] Plainly, public bodies may confine their meetings to specified subject matter and may hold nonpublic sessions to transact business. See n. 6, *supra.*

of constitutional guarantees.[9]   Whatever its duties as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment, or the content of their speech.   See *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972).[10]

(3)

The WERC's order is not limited to a determination that a prohibited labor practice had taken place in the past; it also restrains future conduct.   By prohibiting the school board from "permitting employes . . . to appear and speak at meetings of the Board of Education" the order constitutes an indirect, but effective, prohibition on persons such as Holmquist from communicating with their government.   The order would have a substantial impact upon virtually all communication between teachers and the school board.   The order prohibits speech by teachers "on matters subject to collective bargaining." [11]   As the dissenting opinion below noted, how-

---

[9] The WERC order does not prohibit all speech to the board on the subject of collective bargaining.   Union representatives would continue to be entitled to come before the board at its public meetings and make their views known.   The impact of such a rule is underscored by the fact that the union need not rely upon public meetings to make its position known to the school board; it can also do so at closed negotiating sessions.   See n. 6, *supra.*

[10] Surely no one would question the absolute right of the nonunion teachers to consult among themselves, hold meetings, reduce their views to writing, and communicate those views to the public generally in pamphlets, letters, or expressions carried by the news media.   It would strain First Amendment concepts extraordinarily to hold that dissident teachers could not communicate those views directly to the very decisionmaking body charged by law with making the choices raised by the contract renewal demands.

[11] Counsel for the union conceded at oral argument that the WERC order was constitutionally overbroad, but asked the Court to narrow it

ever, there is virtually no subject concerning the operation of the school system that could not also be characterized as a potential subject of collective bargaining. Teachers not only constitute the overwhelming bulk of employees of the school system, but they are the very core of that system; restraining teachers' expressions to the board on matters involving the operation of the schools would seriously impair the board's ability to govern the district. The Wisconsin court's reliance on *Broadrick* v. *Oklahoma,* 413 U. S. 601 (1973), for the proposition that one whose conduct falls squarely within an otherwise valid proscription may not challenge that proscription on grounds of vagueness, is inapposite. The challenged portion of the order is designed to govern speech and conduct in the future, not to punish past conduct, and as such it is the essence of prior restraint.

The judgment of the Wisconsin Supreme Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice Brennan, with whom Mr. Justice Marshall joins, concurring in the judgment.

By stating that "the extent to which true contract negotiations . . . may be regulated [is] an issue we need not consider at this time," *ante,* at 175, the Court's opinion treats as open a question the answer to which I think is abundantly

---

simply to prohibit the board from negotiating with employees in the bargaining unit. It is not the function of this Court to undertake that task.

On the other hand, it is not the case that Holmquist was speaking "simply as a member of the community." On the contrary, as noted, *supra,* at 171, Holmquist opened his remarks to the board by stating that he represented "an informal committee of 72 teachers in 49 schools." Thus, he appeared and spoke both as an employee and a citizen exercising First Amendment rights.

clear. Wisconsin has adopted, as unquestionably the State constitutionally may adopt, a statutory policy that authorizes public bodies to accord exclusive recognition to representatives for collective bargaining chosen by the majority of an appropriate unit of employees. In that circumstance the First Amendment plainly does not prohibit Wisconsin from limiting attendance at a collective-bargaining session to school board and union bargaining representatives and denying Holmquist the right to attend and speak at the session. That proposition is implicit in the words of Mr. Justices Holmes, that the "Constitution does not require all public acts to be done in town meeting or an assembly of the whole." *Bi-Metallic Investment Co.* v. *State Board of Equalization,* 239 U. S. 441, 445 (1915). Certainly in the context of Wisconsin's adoption of the exclusivity principle as a matter of state policy governing relations between state bodies and unions of their employees, "[t]here must be a limit to individual argument in such matters if government is to go on." *Ibid.* For the First Amendment does not command "that people who want to [voice] their views have a constitutional right to do so whenever and however and wherever they please." *Adderley* v. *Florida,* 385 U. S. 39, 48 (1966). For example, this Court's "own conferences [and] the meetings of other official bodies gathered in executive session" may be closed to the public without implicating any constitutional rights whatever. *Branzburg* v. *Hayes,* 408 U. S. 665, 684 (1972). Thus, the Wisconsin Supreme Court was correct in stating that there is nothing unconstitutional about legislation commanding that in closed bargaining sessions a government body may admit, hear the views of, and respond to only the designated representatives of a union selected by the majority of its employees.

But the First Amendment plays a crucially different role when, as here, a government body has either by its own decision or under statutory command, determined to open

its decisionmaking processes to public view and participation.* In such case, the state body has created a public forum dedicated to the expression of views by the general public. "Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96 (1972). The order sustained by the Wisconsin Supreme Court obviously contravenes that principle. Although there was a complete absence of any evidence that Holmquist's speech was part of a course of conduct in aid of an unfair labor practice by the board, the order commands that the board "shall immediately cease and desist from permitting employes, other than [union] representatives . . . to appear and speak at [board] meetings on matters subject to collective bargaining . . . ." Obedience to that order requires that the board, regardless of any other circumstances, not allow Holmquist or other citizens to speak at a meeting required by Wis. Stat. § 66.77 (1) (1973), now § 19.81 (1) (1976), to be open and dedicated to expressions of views by citizens generally on such subjects, even though they conform with all procedural rules, even though the subject upon which they wish to speak may be addressed by union representatives, and even though they are part of the "public" to which the forum is otherwise open. The order is therefore wholly void. The State could no more prevent Holmquist from speaking at this public forum than it could prevent him from publishing the same views in a newspaper or proclaiming them from a soapbox.

I therefore agree that the judgment of the Wisconsin Supreme Court be reversed.

---

*See discussion and authorities collected in Brief for the AFL–CIO as *Amicus Curiae* 20–24.

MR. JUSTICE STEWART, concurring in the judgment.

The school board of the city of Madison, acting in accordance with state law, invited all members of the public to attend an open meeting whose agenda included discussion of the desirability of an agency-shop arrangement. The board was entirely willing to hear Holmquist, speaking simply as a member of the community, express his views on this subject. Holmquist did not seek, at the meeting or at any other time, to reach agreement or to bargain with the board. The mere expression of an opinion about a matter subject to collective bargaining, whether or not the speaker is a member of the bargaining unit, poses no genuine threat to the policy of exclusive representation that Wisconsin has adopted. I therefore agree that the order entered by the Wisconsin Employment Relations Commission unconstitutionally restricts freedom of speech.

MR. JUSTICE BRENNAN's concurring opinion reaffirms Mr. Justice Holmes' observation that "[t]he Constitution does not require all public acts to be done in town meeting or an assembly of the whole." *Bi-Metallic Investment Co.* v. *State Board of Equalization*, 239 U. S. 441, 445. A public body that may make decisions in private has broad authority to structure the discussion of matters that it chooses to open to the public. Such a body surely is not prohibited from limiting discussion at public meetings to those subjects that it believes will be illuminated by the views of others. And in trying to best serve its informational needs while rationing its time, I should suppose a public body has broad authority to permit only selected individuals—for example, those who are recognized experts on a matter under consideration—to express their opinions. I write simply to emphasize that we are not called upon in this case to consider what constitutional limitations there may be upon a governmental body's authority to structure discussion at public meetings.