Nancy LEVENTHAL; Margaret C. O'Neill, Plaintiffs,

v.

VISTA UNIFIED SCHOOL DISTRICT; School Board President David Hubbard, in his Official Capacity, et al., Defendants.

No. 97–709–BTM(LSP).

United States District Court, S.D. California.

July 1, 1997.

Guylyn R. Cummins, Gray, Cary, Ware, & Freidenrich, San Diego, CA, Jordan C. Budd, ACLU Foundation of San Diego and Imperial Counties, San Diego, CA, for Plaintiffs.

Susan J. Boyle William Wood Merrill Littler, Mendelson, Fastiff, Tichy & Mathiason, San Diego, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION AND SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MOSKOWITZ, District Judge.

## INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for permanent injunction and summary judgment, and Defendants' motion for summary judgment. Apart from the amended reasoning outlined below in Part IV, the Court adopts its order of June 18, 1997 and applies that order to Defendant David Hubbard and to the new Defendants—Jenny Vervynck, Lance Vollmer, Linda Rhoades and Barbara Donovan, sued in their official capacity. Accordingly, for the reasons stated below, the Court grants in part and denies in part Plaintiffs' motion and grants in part and denies in part Defendants' motion.

## BACKGROUND

The following facts are undisputed. Plaintiffs Margaret C. O'Neill ("O'Neill")—a resident, volunteer, and parent of a student in the Vista Unified School District (the "District")—and Nancy Leventhal ("Leventhal")—a resident and community volunteer of the District and a former teacher—bring this action against the District and David Hubbard, Jenny Vervynck, Lance Vollmer, Linda Rhoades and Barbara Donovan, in their official capacity as members of the Vista School Board. Plaintiffs challenge School Board Bylaw No. 9002 (the "Bylaw") under the First and Fourteenth Amendments to the United States Constitution, Article I, §§ 2, 3 and 7 of the California Constitution, and the state's Brown Act, Cal. Gov't Code §§ 54954.3 and 54960, seeking declaratory and injunctive relief.

The Bylaw permits the Board President to "terminate a presenter's address" at an open Board meeting "if a presenter persists, after a warning, to engage in improper conduct or remarks." Bylaw, § C. The Bylaw acknowl-

edges that state law grants the public the right "to directly address the Board on items of interest to the public that are within the subject matter jurisdiction of the Board," but limits those rights "with respect to presenting a complaint or charge against an employee of the District." *Id.* § B. Under the Bylaw, "[c]omplaints against an individual employee will not be heard at open Board meetings unless the individual employee consents." *Id.* § C. In addition, all proposed agenda items must be submitted to the Superintendent nine days before any regular Board meeting to "determine whether the specific matter is directly related to the business of the district or is appropriate for an open Board meeting." *Id.* § A. A decision by the Superintendent not to place an item on the agenda may appealed to the Board. *Id.*

During the public comment portion of the February 20, 1997 Board meeting, the Plaintiffs attempted to address the qualifications and job performance of the District Superintendent, Dr. Jack Gyves ("Gyves"). Specifically, Leventhal expressed concerns that Gyves had a social relationship with Board member Jenny Vervynck ("Vervynck"), and that the relationship might compromise Vervynck's ability to participate in Gyves's contract negotiations and performance evaluations. (Leventhal I Decl., ¶ 5.[1]) Because she had concerns over Gyves's fiscal administration of the District, his supervisory skills, and his prior performance as superintendent of another school district, (*id*, ¶ 8), Leventhal also questioned aloud whether the Board had adequately investigated Gyves prior to hiring him. (Leventhal 1 Decl., ¶ 8; Leventhal 2 Decl., ¶ 5.) As soon as Leventhal mentioned Gyves's qualifications, Board President Hubbard interrupted her, stated that Leventhal was "moving into a personnel issue," and,

pursuant to the Bylaw, informed her that her criticisms could not be made in a public Board meeting. (Leventhal 1 Decl., ¶ 9; Leventhal 2 Decl., ¶ 5.) According to Leventhal, after Hubbard's interruption, she "respectfully—but not voluntarily—terminated [her] comments about the hiring of Dr. Gyves, rather than face the indignity of further censorship and disruption of the proceedings...." (Leventhal 2 Decl., ¶ 7.)

At the February 20 meeting, O'Neill also tried to raise the issue of Gyves's performance at his former position and was similarly rebuffed by Hubbard. (O'Neill 2 Decl., ¶ 3.) O'Neill claims she omitted certain remarks about Gyves[2] from her prepared statement, "not voluntarily" but because "Mr. Hubbard threatened to clear the meeting room if I continued to criticize Dr. Gyves." (*Id.* ¶ 6.)

During the next Board meeting on March 6, 1997, Vervynck responded to Leventhal's comments from the previous meeting. Vervynck characterized Leventhal as a "voice[ ] of criticism" who "sought to destroy and dismantle" through "innuendo" and the "impugning" of Vervynck's integrity. (Tr. of March 6, 1997 Bd. Mtg., Ex. B to Dow Decl., at 1.) Neither Hubbard nor any other Board member interrupted Vervynck during her statement. Leventhal then spoke, remarking that "it is totally inappropriate to have a community member who is using their free speech rights to speak ... lectured and have judgments made about them publicly." (*Id.* at 5.) Hubbard responded to Leventhal, explaining that while criticisms of the Board and the District were permissible, "I'm not going to allow this to turn into a situation where members of the public engage board members in personal attacks.... [I]f that's an abridgment of First Amendment rights,

---

[1] The Plaintiffs have submitted numerous declarations in connection with the motions now before the Court. For the sake of simplicity, "Leventhal 1 Decl." and "O'Neill 1 Decl." refer to the declarations filed on May 19, 1997 in support of Plaintiffs' motion for summary judgment. "Leventhal 2 Decl." and "O'Neill 2 Decl." refer to the declarations filed on June 2, 1997 in support of Plaintiffs' opposition to Defendants' motion for summary judgment. "Leventhal 3 Decl." refers to Leventhal's supplemental declaration filed on

June 9, 1997 in support of Plaintiffs' motion for summary judgment.

[2] According to O'Neill, she omitted the following statement from her remarks: "It is my understanding that in the last two school districts Dr. Gyves has worked in, monies have been paid to him in order to break his contract, due to similar budget problems. In my opinion if this were the past history of Dr. Gyves it would suggest a pattern of behavior." (O'Neill 2 Decl., ¶ 4.)

then I'll wait for a court of law to tell me that." (*Id.*)

In addition to Leventhal and O'Neill, other members of the District community have expressed concerns regarding their ability to address the Board on matters of public concern.[3]

The Board addressed the propriety and legality of the Bylaw at a March 20, 1997 open Board meeting, reiterating that the regulation barred criticism of District employees in open sessions and explaining that the District had no intention of changing the bylaw. The Plaintiffs have declined invitations to air their complaints about the Superintendent in closed sessions.

Since the March meetings, the Plaintiffs contend that the Bylaw continues to inhibit their ability to discuss public issues at open Board meetings. For example, concerns have recently arisen as to whether several top school officials—including Superintendent Gyves—have failed to comply with state bidding laws in connection with the renovation of Vista High School's softball fields. Although the controversy has received some media attention, *see, e.g.,* Philip K. Ireland, *VUSD board to discipline employees,* North County Times, June 7, 1997, at A1, Leventhal refrained from discussing it in a June 7, 1997 Board meeting lest she violate the Bylaw and risk being silenced or ejected from the meeting. (Leventhal 3 Decl., ¶ 2.)

**3.** For instance, Mary Bristol, mother of five former and two current students in the district, has submitted a declaration describing her participation in the March 20, 1997 Board meeting. At that meeting, Bristol expressed her concerns about Gyves's support for a proposal to redraw the District's boundary lines. (Bristol Decl., ¶ 5.) According to Bristol, Gyves denied that he had endorsed the proposal, "attack[ing]" Bristol's credibility and referring to her remarks as "bizarre" and "about typical of the accuracy of your statements historically." (*Id.* ¶ 6.) Bristol states that Hubbard, the Board President, made no effort to restrain Gyves's comments, "despite the fact that Mr. Hubbard has repeatedly silenced several members of the public who have attempted to criticize Dr. Gyves and various Board members at recent Board meetings." (*Id.* ¶ 9.) Bristol concludes, "Based on Mr. Hubbard's continuing enforcement of Bylaw No. 9002, I now

# DISCUSSION

## I. Eleventh Amendment immunity

Defendants argue that because school districts are state agencies for purposes of the Eleventh Amendment, *see Belanger v. Madera Unified School Dist.,* 963 F.2d 248, 251 (9th Cir.1992), the District and the individual Defendants are immune from suit.

■ As to the District itself, the Court agrees that the Eleventh Amendment bars the Plaintiffs' claims. *See, e.g., Cerrato v. San Francisco Community College Dist.,* 26 F.3d 968, 972 (9th Cir.1994) (holding college school district immune from suit in federal court under Eleventh Amendment). This holding has little practical effect, however, because Plaintiffs' claims against the Board members in their official capacity remain in the case. Since *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been well established that plaintiffs may sue state officers in their official capacity for prospective injunctive and declaratory relief. *See, e.g., Seminole Tribe of Florida v. Florida,* —— U.S. ——, ——, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996) ("[S]ince our decision in *Ex parte Young* . . ., we have often found federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief". . . . (citation omitted)); *Papasan v. Allain,* 478 U.S. 265, 278, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986) ("[R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though

refrain from speaking openly at public Board meetings about my concerns and criticisms regarding the District Superintendent's qualifications and performance." (*Id.* ¶ 10.)

In addition, Leonard Rosen alleges in his declaration that at the March 20 Board meeting he attempted to respond to Vervynck's remarks about Leventhal, stating to the Board, "I have never been more horrified or shocked than I was at the last meeting of this Board. The way that you—Ms. Vervynck—used your office to attack a member of this community." (Rosen Decl., ¶ 7.) Hubbard stopped Rosen and warned him that "personally challenging a board member" was prohibited. Rosen refused to continue under those restrictions. (*Id.*) The Board has since declared that criticism. of Board members, as opposed to employees of the District, is permitted under the Bylaw.

accompanied by a substantial ancillary effect on the state treasury."); *Natural Resources Defense Council v. California Dep't of Transp.*, 96 F.3d 420, 423 (9th Cir.1996) (holding that Eleventh Amendment does not bar federal suit against state official for prospective injunctive relief); *Cerrato*, 26 F.3d at 973 ("It is well established that the Eleventh Amendment does not bar a federal court from granting prospective injunctive relief against an officer of the state who acts outside the bounds of his authority."). Accordingly, the Board members are subject to suit under 42 U.S.C. § 1983 for prospective injunctive and declaratory relief. *See, e.g., Chaloux v. Killeen*, 886 F.2d 247, 252 (9th Cir.1989) ("[A]lthough the Supreme Court held recently [in *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ] that state or state officials are not considered 'persons' under § 1983, this holding does not apply when a state official in his or her official capacity is sued for prospective relief.").

*II. Applicable law*

■ As a general rule, courts should "avoid adjudication of federal constitutional claims when alternative state grounds are available." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391–92 (9th Cir.1994). This concept applies even where, as here, the alternate ground is based in state constitutional law. *See Carreras v. City of Anaheim*, 768 F.2d 1039, 1042–43 (9th Cir.1985).

■ In the instant case, however, the avoidance doctrine conflicts with an even stronger constitutional rule. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that the Eleventh Amendment bars federal courts from granting injunctive relief against state officials for violations of state law. *See Ashker v. California Dep't of Corrections*, 112 F.3d 392, 394 (9th Cir.1997). The Court thus lacks jurisdiction to hear Plaintiffs' pendent state law claims for declaratory and injunctive relief.

Although the Defendants did not raise this argument, the Court has an independent duty to examine its own jurisdiction. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 229, 110 S.Ct. 596, 606–07, 107 L.Ed.2d 603 (1990). Accordingly, the Court need not and cannot invoke the avoidance doctrine to consider Plaintiffs' state law claims.

*III. Ban on criticism of employees in open meetings: Bylaw No. 9002 §§ B and C*

■ Plaintiffs' primary claims challenge the Bylaw's restrictions on raising "complaints" or "charges" against District employees at open Board meetings.[4] Bylaw, §§ B & C. As explained below, the Court finds the criticism provisions to be violative of core First Amendment values.

Because it concerns the government's ability to limit private expression in a public context, this case is governed by the public forum doctrine. Although the doctrine's roots can be traced back to dicta in the Supreme Court's decision in *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939), the modern categorical approach began with *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In *Perry*, the Court identified three distinct types of fora: first, "traditional" public fora—"places which by long tradition or government fiat have been devoted to assembly and debate;" second, "limited" public fora—"public property which the State has opened for use by the public as a place for expressive activity;" and third, "nonpublic" fora—property not dedicated in any significant way to free or open communication. *Id.* at 45–46, 103 S.Ct. at 954–56.

Under this categorical system, the state's ability to regulate speech depends on the nature of the forum. The government's power to restrict expression in traditional public fora, the *Perry* Court explained, is extremely limited: "reasonable time, place and manner regulations are permissible, and a content-

---

**4.** Although it conceivable that, on its face, the Bylaw regulates only formal charges filed against District employees, the District has read the Bylaw to cover even informal criticism about the employees. The Court will accept this interpre-

tation of the Bylaw as accurate. *See, e.g., Smiley v. Citibank,* — U.S. ——, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996) (noting deference accorded to agency interpretation of its own regulations).

based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46, 103 S.Ct. at 955–56. The Court imposed similar restraints on speech in limited public fora: "Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* In nonpublic fora, the government may restrict expression only if the regulation is reasonable and viewpoint-neutral. *Id.*

■ The first step in the public forum analysis requires the Court to determine the nature of the forum at issue. Here, the Court finds that the open Board meetings are limited public fora, "i.e., fora open to the public in general, but limited to comments related to the school board's 'subject matter.'" *Baca v. Moreno Valley Unified School Dist.,* 936 F.Supp. 719, 729 (C.D.Cal. 1996). In *City of Madison Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), where the Supreme Court invalidated a restriction on non-union employee speech at open school board meetings, the Court noted that "the State ha[d] opened a forum for direct citizen involvement." *Id.* at 175, 97 S.Ct. at 426. Because the case pre-dated *Perry's* categorical public forum approach, the Court in *Madison* did not explicitly refer to the school board meeting as a "limited public forum." Nonetheless, in establishing the three public forum categories, the *Perry* Court cited the school board in *Madison* as a quintessential example of a limited public forum, *Perry,* 460 U.S. at 45, 46 n. 7, 103 S.Ct. at 954–55, 955 n. 7. Since *Perry,* courts have regularly read *Madison* to have declared open school board meetings to be limited public fora. *See, e.g., Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 803, 105 S.Ct. 3439, 3449–50, 87 L.Ed.2d 567 (1985) ("[I]n *Madison* …, the Court held that a forum for citizen involvement was created by a state statute providing for open school board meetings."); *Baca,* 936 F.Supp. at 728, 729 (citing *Madison* and holding that school board meetings are limited public fora); *Clark v. Burleigh,* 4 Cal.4th 474, 489, 14 Cal.Rptr.2d 455, 841 P.2d 975 (1992) (noting that *Madison*

"presented a designated public forum unlimited as to speakers but not as to topic: any member of the public could speak, but only on school board business").

Although the Ninth Circuit has expressed uncertainty about *Madison's* application to city board meetings, *Kindt v. Santa Monica Rent Control Bd.,* 67 F.3d 266, 270 (9th Cir. 1995) (stating that city council and city board meetings "fit more neatly into the nonpublic forum niche"), those meetings are distinguishable from the District's Board meetings for several reasons. First and most simply, since *Madison* the Supreme Court has never wavered from its characterization of school boards as limited public fora. Second, California statutory law mandates the open nature of school board meetings not only in the Brown Act, Cal. Gov't Code §§ 54953 and 54954.3 (requiring meetings of certain public bodies, including school boards, to be open to the public, and declaring that the public must be allowed to speak "on any item of interest to the public … that is within the subject matter jurisdiction of the legislative body"), but also in the Education Code, Cal. Educ. Code § 35145.5 ("Every agenda for regular meetings shall provide an opportunity for members of the public to directly address the governing board on any item of interest to the public … that is within the subject matter jurisdiction of the governing board.").

As noted above, content-based restrictions in a limited public forum (beyond those defining the forum's boundaries) are permissible only if they are narrowly drawn to advance a compelling state interest. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). It seems clear that the Bylaw's prohibition on criticism of District employees is a content-based regulation. *See Baca,* 936 F.Supp. at 729 ("It is difficult to imagine a more content-based prohibition on speech than this policy…."). It is equally clear that the District's concerns and interests in proscribing public commentary cannot outweigh the public's fundamental right to engage in robust public discourse on school issues.

■ Debate over public issues, including the qualifications and performance of public officials (such as a school superintendent), lies at the heart of the First Amendment. *See, e.g., Schenck v. Pro–Choice Network*, —— U.S. ——, ——, 117 S.Ct. 855, 858, 137 L.Ed.2d 1 (1997) (noting that "commenting on matters of public concern" is "classic form[ ] of speech that lie[s] at the heart of the First Amendment"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–45, 115 S.Ct. 1511, 1518, 131 L.Ed.2d 426 (1995) (remarking that political speech "occupies the core of the protection afforded by the First Amendment"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776–77, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978) (suggesting that discussion of public issues lies "at the heart of the First Amendment's protection"); *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) ("The First Amendment affords the broadest protection to ... political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" (second alteration in original) (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308–09, 1 L.Ed.2d 1498 (1957))). Central to these principles is the ability to question and challenge the fitness of the administrative leader of a school district, especially in a forum created specifically to foster discussion about a community's school system. As the Supreme Court explained in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964):

> The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. [I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for vigorous advocacy no less than abstract discussion.

*Id.* at 269, 84 S.Ct. at 720 (internal quotations and citations omitted).

Defendants contend that these concerns are outweighed by the District's interest in protecting the privacy and property rights of its employees. They rely primarily on section 54957 of the Brown Act, which provides:

> Nothing contained in this chapter shall be construed to prevent the legislative body of a local agency ... from holding closed sessions ... to consider the appointment, employment, evaluation of performance, discipline, or dismissal of a public employee or to hear complaints or charges brought against the employee by another person or employee unless the employee requests a public session.

Cal. Gov't Code § 54957. According to the District, this section codifies the protections for the privacy and property rights of public employees and thus requires the Board to limit criticism of the employees to closed meetings.

■ Before examining the Defendants' contentions, it is important to remember that even if the Brown Act sanctioned the Bylaw, First Amendment speech guarantees would trump the statute. It is no defense to suggest that since the Brown Act created the Board meetings, the Brown Act can also authorize unconstitutional limitations on those meetings. The essence of the public forum doctrine is the notion that although the government need not devote its property to expressive activity, once it does it is bound by the strictures of the First Amendment.

■ That said, the Brown Act provides little support for the District's position. Although § 54957 allows public employees to demand that a governing body air complaints about the employee in public, it does not grant the employees the right to force the conflict behind closed doors. Similarly, while the Brown Act permits governing bodies to hold closed sessions about personnel matters, nowhere does it grant those bodies the exceedingly broader authority to silence public speech that may also touch upon related employment issues. As noted above, the sections of the Brown Act and the Education Code that require the Board to hold public meetings grant the public a right to speak "on *any* item of interest to the public ... that is within the subject matter jurisdiction"

of the Board, without exception. Cal. Gov't Code § 54954.3(a) (emphasis added); Cal. Educ.Code § 35145.5 (emphasis added).

The preamble to the Brown Act sets forth the primary purposes of the Act as a whole:

> The people of this state do not yield their sovereignty to the agencies which serve them. The people, in delegating authority, do not give their public servants their right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created.

Cal. Gov't Code § 54950. In *San Diego Union v. City Council*, 146 Cal.App.3d 947, 954, 196 Cal.Rptr. 45 (1983), the court balanced the same two Brown Act provisions (the "personnel exception" of § 54957 and the "sunshine law" of § 54953) apparently in conflict in the instant case. Citing the statute's preamble, the court concluded that it "must construe the 'personnel exception' narrowly and the 'sunshine law' liberally in favor of openness." *Id*, at 955, 196 Cal.Rptr. 45. The court explained, "Public visibility breeds public awareness which in turn fosters public activism politically and subtly encouraging the governmental entity to permit public participation in the discussion process." *Id.* Thus, while the Brown Act authorizes a school board to discuss personnel matters in closed session, it does not preclude the public from raising such matters at open Board meetings. Once the matter has surfaced in public, the Board and the employee still may adjudicate the matter in closed session.

 While the Court recognizes the privacy and property interests of the District's employees, the District's asserted interests pale in comparison to the expressive rights of the public. In *Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719 (C.D.Cal. 1996), the district court invalidated a local ordinance strikingly similar to the Bylaw here. Responding to comparable arguments by the defendants, the *Baca* court explained that the

District's interest in protecting its employees' right of privacy is an interest it holds only as an employer, not as a government entity, e.g., a legislative body charged with permitting public comment at its meetings. Thus, its interest as an employer in protecting its employees' right to privacy cannot be characterized as a compelling governmental interest.

*Id.* at 732. This echoes the Supreme Court's discussion in *Madison* of the multi-faceted nature of school board operations: "Whatever its duties as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of their employment or the content of their speech." *Madison*, 429 U.S. at 176, 97 S.Ct. at 426. In presiding over open Board meetings, the District provides a forum for the Plaintiffs' critical comments; it does not endorse, sanction, or act upon those comments at the open meeting. *See Baca*, at 732 n. 13 (noting how, under Brown Act, decisions over employees' appointment, performance evaluation, discipline/dismissal/release, salaries, workers' compensation claims, etc. are considered by Board in closed session). As a result, the public's statements cannot, as a matter of law, give rise to an insulted employees' claim for defamation or deprivation of due process. *See Baca*, 936 F.Supp. at 733 (noting that "one who is not the employee's employer can not directly deprive the employee of due process" (citing *Gini v. Las Vegas Metropolitan Police Dep't*, 40 F.3d 1041, 1044 (9th Cir.1994))).

Additionally, it is noteworthy that the Bylaw has not been used to protect "the need for civility and expedition in the carrying out of public business." *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270 (9th Cir. 1995). There has been no claim that the Plaintiffs disrupted any Board meeting. If and when such problems do arise, the Board has at its disposal other sections of the Brown Act designed to restoring order and civility to the public meetings. *See, e.g.*, Cal. Gov't Code § 54957.9 [5]

---

5. That section provides in relevant part:
 In the event that any meeting is willfully interrupted by a group or groups of persons so as to

render the orderly conduct of such meeting unfeasible and order cannot by restored by the removal of individuals who are willfully inter-

In *Madison,* the challenged regulation prohibited public speech by teachers "on matters subject to collective bargaining." *Madison,* 429 U.S. at 176, 97 S.Ct. at 427. Invalidating the restriction, the Supreme Court noted its potentially broad scope, remarking that "there is virtually no subject concerning the operation of the school system that could not also be characterized as a potential subject of collective bargaining." *Id.* at 177, 97 S.Ct. at 427–28. So, too, most items within the Board's "subject matter jurisdiction" can be recast as "personnel" issues and therefore subjected to the Bylaw's limitation. Thus, as in *Madison,* restraining the public's "expression to the board on matters involving the operation of the schools would seriously impair the board's ability to govern the district." *Id.* For these reasons, the Bylaw cannot withstand the constitutional scrutiny applied to limited public fora.

 Alternatively, the Bylaw fails even under the more deferential standard of review applied to speech restrictions in nonpublic fora. As mentioned above, regulations in nonpublic fora will survive a constitutional challenge only if they are "reasonable in light of the purpose served by the forum and are viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 2146–47, 124 L.Ed.2d 352 (1993) (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 3451, 87 L.Ed.2d 567 (1985)). Although content-based restrictions are permissible in nonpublic fora, laws that discriminate not only on the subject matter of speech but also on the viewpoint of the speaker violate core free speech principles. In *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), the Supreme Court explained:

> When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egre-

gious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology is the rationale for the restriction.

*Id.* at 829, 115 S.Ct. at 2516 (citations omitted).

The Bylaw effectuates a classic form of viewpoint discrimination. As the *Baca* court noted, the regulation "allows expression of two points of view (laudatory and neutral) while prohibiting a different point of view (negatively critical) on a particular subject matter (District employees' conduct or performance)." *Baca,* 936 F.Supp. at 730. This system engenders discussion artificially geared toward praising (and maintaining) the status quo, thereby foreclosing meaningful public dialogue and, ultimately, dynamic political change.

The Bylaw fosters yet another form of viewpoint discrimination, unfairly permitting one-sided debate at Board meetings. As previously discussed, Superintendent Gyves and Board member Vervynck criticized several non-employee speakers. (*See, e.g.,* Rosen Decl. ¶¶ 5,7; Bristol Decl. ¶¶ 6, 8–9.) Yet members of the community at large cannot respond to these charges, even to discuss the same subject matter or issue, if Board President Hubbard determines that their comments relate to a "personnel issue." In other words, the Bylaw permits the expression of one viewpoint ("complaints" or "charges" against members of the public) but not another ("complaints" or "charges" against District employees). Accordingly, even if the Board meetings were nonpublic fora, the Bylaw operates in direct violation of the First Amendment.

The Defendants' limitation on public criticism is of particular concern in this case, arising as it does in the context of public education. The public entrusts school boards with the education of its children, and the schools play a critical role in the social, ethical, and civic development of those students. To relegate discussion on the education of a community's children to closed, back-room

rupting the meeting, the members of the legislative body conducting the meeting may order the meeting room cleared and continue in session.

Cal. Gov't Code § 54957.9.

sessions would deprive the public of the most appropriate forum to debate these issues. As Justice Jackson warned in *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943): "That [school boards] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *See also, e.g., Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 251; 5 L.Ed.2d 231 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

It should be made clear that the Court does not pass on the District's ability to limit the forum for complaints for actual disciplinary action against teachers, custodians, cafeteria workers and other non-policymaking employees of the District alleging specific violations of the law or District policies and regulations. Whether the District may require such a complaint to be raised in closed session is not before the Court. The Bylaw at issue here as interpreted by the Defendants proscribes public criticism of all employees, including the Superintendent and other District employees who, at the public's expense and with the public's trust, create and execute policies ranging from public expenditures to everyday student affairs. The Plaintiffs have not sought to file actual complaints for discipline, nor do they allege they intend to, against non-policymaking District employees. Thus, the Court need not decide whether the District can create very narrow

Bylaws relating to such complaints for disciplinary action.

Moreover, the Court does not pass on the District's ability to protect its students' right to privacy. *See, e.g.,* Cal. Educ.Code § 35146. The Bylaw in question here is not limited to precluding mentioning students by name. Whether a narrowly drawn bylaw safeguarding the privacy rights of students named at Board meetings would pass constitutional muster also is not before the Court today.

Finally, the Court reiterates that this decision does not invalidate § 54957 of the Brown Act. As discussed above, the Brown Act does not authorize the Bylaw's broad criticism ban, so the constitutionality of the Brown Act has never been at issue here.

## IV. Prior approval of agenda items: Bylaw No. 9002 § A

 Plaintiffs have standing to challenge Bylaw § A, the provision regulating the placement of agenda items,[6] notwithstanding the fact that Defendants have never denied any of the Plaintiffs' requests to add an item to a Board meeting agenda.[7] *See, e.g., Gaudiya Vaishnava Society v. City and County of San Francisco,* 952 F.2d 1059, 1062 (9th Cir.1990) (holding that plaintiffs have standing to pursue facial challenge to alleged prior restraint "without the necessity of first applying for, and being denied, a permit" (citing *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988))). Nonetheless, the Court holds that once the Bylaw is stripped of the criticism bans contained in

6. That section reads in relevant part:

> Any member of the public who desires to place a matter for information or action on the agenda of an open Board meeting shall notify the Superintendent in writing at least nine working days before any regular meeting. The written notification shall specify the matter and include any relevant background information. The Superintendent shall determine whether the specific matter is directly related to the business of the district or is appropriate for an open Board meeting. The Superintendent will provide a written response to the person requesting the item with a copy to Board members. Any decision by the Superin-

> tendent not to place a requested matter on the agenda may be appealed in writing to the Board. The appeal will be placed on the agenda of the next regular meeting for action by the board.
> Bylaw, § A.

7. The Court corrects its June 18, 1997 order and notes that the public's right to speak at open school board meetings includes the right to place school matters on the agenda of those meetings. Cal. Educ.Code § 35145.5. As discussed below, however, the Court still finds Bylaw § A to be a permissible mechanism for determining, prior to an open Board meeting, whether a proposed agenda item is "directly related to school district business." *Id.*

§§ B and C, § A is not an unconstitutional prior restraint.

Read in light of the First Amendment principles outlined in this decision, the Superintendent's determination of whether a proposed agenda item is "appropriate for an open Board meeting" is limited to consideration of whether the item falls "within the subject matter jurisdiction of the legislative body." Cal. Gov't Code § 54954.3. As a matter of law, the Superintendent cannot factor into his or her decision any additional viewpoint- or content–based criteria. Moreover, § A contains sufficient procedural safeguards necessary to secure constitutional compliance. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 605–06, 107 L.Ed.2d 603 (1990) (noting three procedural safeguards required of prior restraints). While the Bylaw does not explicitly place time limits on the Superintendent's decision to grant or deny agenda requests, it does provide that requests be made "at least nine working days before any regular meaning." The Court reads into this language an implicit requirement that the Superintendent rule on the request within that nine-day period. Furthermore, § A affords members of the community the opportunity to contest any denials by the Superintendent in a prompt and public hearing. Bylaw, § A ("The appeal will be placed on the agenda of the next regular meeting for action by the Board."). While mindful of the dangers of prior restraints, the Court recognizes that the Board must have some authority to set its agenda or it would be unable to conduct its business. With the above limitations read into the Bylaw, then, § A does not rise to the level of a proscribed prior restraint.[8]

As a final note, each Board meeting features a "public comment period" apart from the regular agenda items. Thus, even if the Plaintiffs were unable to place a given issue on the Board's agenda, they could still raise their concerns during the public comment period.

### CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' motion for summary judgment and permanent injunction and grants in part and denies in part the Defendants' motion for summary judgment[9] The Court declares that the prohibitions on any criticism, "complaint or charge against an employee of the District" contained in Vista Unified School District Bylaw No. 9002, §§ B and C, violate the Plaintiffs' rights secured under the First and Fourteenth Amendments to the United States Constitution. Defendants David Hubbard, Jenny Vervynck, Lance Vollmer, Linda Rhoades and Barbara Donovan, acting in their official capacity as members of the School Board of the Vista Unified School District, and their agents, successors, *see Hafer v. Melo,* 502 U.S. 21, 24–25, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301 (1991) ("[W]hen officials sued in [their official capacity] in federal court die or leave office, their successors automatically assume their roles in this litigation"), and employees who have received notice of this order, are hereby permanently enjoined and restrained from enforcing the prohibitions on any criticism, "complaint or charge against an employee of the District" contained in Vista Unified School District Bylaw No. 9002, §§ B and C.

IT IS SO ORDERED.

---

8. The Court notes that while a matter may be placed on the agenda for public comment, it may not necessarily be "appropriate" for the Board to discuss the comments raised. For example, the public may wish to be heard on pending litigation or contract negotiations, but the Board members may choose not to respond to protect lawyer-client privileged communications or bargaining positions.

9. Although the Court grants Defendants' motion in part by dismissing Defendant District and dismissing the supplemental state law claims as to all Defendants, the Court finds that Plaintiffs have overwhelmingly prevailed on the core elements of their action, and there will be no apportionment as to any costs and attorneys' fees the Plaintiffs seek to recover, except as to the time spent for researching and briefing the propriety of naming the District as a Defendant. *See Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1499 (9th Cir.1995). The Court having dismissed the District as a party, the Plaintiff is not entitled to fees in this regard. *See Hensley v. Eckerhart,* 461 U.S. 424, 434–37, 103 S.Ct. 1933, 1939–41, 76 L.Ed.2d 40 (1983).