Justice Souter,
with whom
Justice Stevens and Justice Ginsburg join, dissenting.
The Court holds that “when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.” Ante, at 421. I respectfully dissent. *428 I agree with the majority that a government employer has substantial interests in effectuating its chosen policy and objectives, and in demanding competence, honesty, and judgment from employees who speak for it in doing their work. But I would hold that private and public interests in addressing official wrongdoing and threats to health and safety can outweigh the government’s stake in the efficient implementation of policy, and when they do public employees who speak on these matters in the course of their duties should be eligible to claim First Amendment protection.
I
Open speech by a private citizen on a matter of public importance lies at the heart of expression subject to protection by the First Amendment. See, e. g., Schenck v. Pro-Choice Network of Western N. Y., 519 U. S. 357, 377 (1997). At the other extreme, a statement by a government employee complaining about nothing beyond treatment under personnel rules raises no greater claim to constitutional protection against retaliatory response than the remarks of a private employee. See Connick v. Myers, 461 U. S. 138, 147 (1983). In between these points lies a public employee’s speech unwelcome to the government but on a significant public issue. Such an employee speaking as a citizen, that is, with a citizen’s interest, is protected from reprisal unless the statements are too damaging to the government’s capacity to conduct public business to be justified by any individual or public benefit thought to flow from the statements. Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563, 568 (1968). Entitlement to protection is thus not absolute.
This significant, albeit qualified, protection of public employees who irritate the government is understood to flow from the First Amendment, in part, because a government paycheck does nothing to eliminate the value to an individual of speaking on public matters, and there is no good *429 reason for categorically discounting a speaker’s interest in commenting on a matter of public concern just because the government employs him. Still, the First Amendment safeguard rests on something more, being the value to the public of receiving the opinions and information that a public employee may disclose. “Government employees are often in the best position to know what ails the agencies for which they work.” Waters v. Churchill, 511 U. S. 661, 674 (1994).
The reason that protection of employee speech is qualified is that it can distract co-workers and supervisors from their tasks at hand and thwart the implementation of legitimate policy, the risks of which grow greater the closer the employee’s speech gets to commenting on his own workplace and responsibilities. It is one thing for an office clerk to say there is waste in government and quite another to charge that his own department pays full-time salaries to part-time workers. Even so, we have regarded eligibility for protection by Pickering balancing as the proper approach when an employee speaks critically about the administration of his own government employer. In Givhan v. Western Line Consol. School Dist., 439 U. S. 410 (1979), we followed Pickering when a teacher was fired for complaining to a superior about the racial composition of the school’s administrative, cafeteria, and library staffs, 439 U. S., at 413-414, and the same point was clear in Madison Joint School Dist. No. 8 v. Wisconsin Employment Relations Comm’n, 429 U. S. 167 (1976). That case was decided, in part, with reference to the Pickering framework, and the Court there held that a schoolteacher speaking out on behalf of himself and others at a public school board meeting could not be penalized for criticizing pending collective-bargaining negotiations affecting professional employment. Madison noted that the teacher “addressed the school board not merely as one of its employees but also as a concerned citizen, seeking to express his views on an important decision of his government.” 429 *430 U. S., at 174-175. In each case, the Court realized that a public employee can wear a citizen’s hat when speaking on subjects closely tied to the employee’s own job, and Givhan stands for the same conclusion even when the speech is not addressed to the public at large. Cf. Pegram v. Herdrich, 530 U. S. 211, 225 (2000) (recognizing that, factually, a trustee under the Employee Retirement Income Security Act of 1974 can both act as ERISA fiduciary and act on behalf of the employer).
The difference between a case like Givhan and this one is that the subject of Ceballos’s speech fell within the scope of his job responsibilities, whereas choosing personnel was not what the teacher was hired to do. The effect of the majority’s constitutional line between these two cases, then, is that a Givhan schoolteacher is protected when complaining to the principal about hiring policy, but a school personnel officer would not be if he protested that the principal disapproved of hiring minority job applicants. This is an odd place to draw a distinction,[1] and while necessary judicial line-drawing sometimes looks arbitrary, any distinction obliges a court to justify its choice. Here, there is no adequate justification for the majority’s line categorically denying Pickering protection to any speech uttered “pursuant to ... official duties,” ante, at 421.
As all agree, the qualified speech protection embodied in Pickering balancing resolves the tension between individual and public interests in the speech, on the one hand, and the government’s interest in operating efficiently without distraction or embarrassment by talkative or headline-grabbing employees. The need for a balance hardly disappears when an employee speaks on matters his job requires him to address; rather, it seems obvious that the individual and public *431 value of such speech is no less, and may well be greater, when the employee speaks pursuant to his duties in addressing a subject he knows intimately for the very reason that it falls within his duties.[2]
As for the importance of such speech to the individual, it stands to reason that a citizen may well place a very high value on a right to speak on the public issues he decides to make the subject of his work day after day. Would anyone doubt that a school principal evaluating the performance of teachers for promotion or pay adjustment retains a citizen’s interest in addressing the quality of teaching in the schools? (Still, the majority indicates he could be fired without First Amendment recourse for fair but unfavorable comment when the teacher under review is the superintendent’s daughter.) Would anyone deny that a prosecutor like Richard Ceballos may claim the interest of any citizen in speaking out against a rogue law enforcement officer, simply because his job requires him to express a judgment about the officer’s performance? (But the majority says the First Amendment *432 gives Ceballos no protection, even if his judgment in this case was sound and appropriately expressed.)
Indeed, the very idea of categorically separating the citizen’s interest from the employee’s interest ignores the fact that the ranks of public service include those who share the poet’s “object... to unite [m]y avocation and my vocation”;[3] these citizen servants are the ones whose civic interest rises highest when they speak pursuant to their duties, and these are exactly the ones government employers most want to attract.[4] There is no question that public employees speaking on matters they are obliged to address would generally *433 place a high value on a right to speak, as any responsible citizen would.
Nor is there any reason to raise the counterintuitive question whether the public interest in hearing informed employees evaporates when they speak as required on some subject at the core of their jobs. Last Term, we recalled the public value that the Pickering Court perceived in the speech of public employees as a class: “Underlying the decision in Pickering is the recognition that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public’s interest in receiving informed opinion as it is the employee’s own right to disseminate it.” San Diego v. Roe, 543 U. S. 77, 82 (2004) (per curiam) (citation omitted). This is not a whit less true when an employee’s job duties require him to speak about such things: when, for example, a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior’s order to violate constitutional rights he is sworn to protect. (The majority, however, places all these speakers beyond the reach of First Amendment protection against retaliation.)
Nothing, then, accountable on the individual and public side of the Pickering balance changes when an employee speaks “pursuant” to public duties. On the side of the government employer, however, something is different, and to this extent, I agree with the majority of the Court. The majority is rightly concerned that the employee who speaks out on matters subject to comment in doing his own work has the greater leverage to create office uproars and fracture the government’s authority to set policy to be carried out *434 coherently through the ranks. “Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees’ official communications are accurate, demonstrate sound judgment, and promote the employer’s mission.” Ante, at 422-423. Up to a point, then, the majority makes good points: government needs civility in the workplace, consistency in policy, and honesty and competence in public service.
But why do the majority’s concerns, which we all share, require categorical exclusion of First Amendment protection against any official retaliation for things said on the job? Is it not possible to respect the unchallenged individual and public interests in the speech through a Pickering balance without drawing the strange line I mentioned before, supra, at 430? This is, to be sure, a matter of judgment, but the judgment has to account for the undoubted value of speech to those, and by those, whose specific public job responsibilities bring them face to face with wrongdoing and incompetence in government, who refuse to avert their eyes and shut their mouths. And it has to account for the need actually to disrupt government if its officials are corrupt or dangerously incompetent. See n. 4, supra. It is thus no adequate justification for the suppression of potentially valuable information simply to recognize that the government has a huge interest in managing its employees and preventing the occasionally irresponsible one from turning his job into a bully pulpit. Even there, the lesson of Pickering (and the object of most constitutional adjudication) is still to the point: when constitutionally significant interests clash, resist the demand for winner-take-all; try to make adjustments that serve all of the values at stake.
Two reasons in particular make me think an adjustment using the basic Pickering balancing scheme is perfectly feasible here. First, the extent of the government’s legitimate authority over subjects of speech required by a public job *435 can be recognized in advance by setting in effect a minimum heft for comments with any claim to outweigh it. Thus, the risks to the government are great enough for us to hold from the outset that an employee commenting on subjects in the course of duties should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it. The examples I have already given indicate the eligible subject matter, and it is fair to say that only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee’s favor. If promulgation of this standard should fail to discourage meritless actions premised on 42 U. S. C. § 1983 (or Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971)) before they get filed, the standard itself would sift them out at the summary-judgment stage.[5]
My second reason for adapting Pickering to the circumstances at hand is the experience in Circuits that have recognized claims like Ceballos’s here. First Amendment protection less circumscribed than what I would recognize has been available in the Ninth Circuit for over 17 years, and neither there nor in other Circuits that accept claims like this one has there been a debilitating flood of litigation. There has indeed been some: as represented by Ceballos’s lawyer at oral argument, each year over the last five years, approximately 70 cases in the different Courts of Appeals and approximately 100 in the various District Courts. Tr. of Oral Arg. 58-59. But even these figures reflect a readiness to litigate that might well have been cooled by my view about *436 the importance required before Pickering treatment is in order.
For that matter, the majority’s position comes with no guarantee against factbound litigation over whether a public employee’s statements were made “pursuant to . . . official duties,” ante, at 421. In fact, the majority invites such litigation by describing the enquiry as a “practical one,” ante, at 424, apparently based on the totality of employment circumstances.[6] See n. 2, supra. Are prosecutors’ discretionary statements about cases addressed to the press on the courthouse steps made “pursuant to their official duties”? Are government nuclear scientists’ complaints to their supervisors about a colleague’s improper handling of radioactive materials made “pursuant” to duties?
II
The majority seeks support in two lines of argument extraneous to Pickering doctrine. The one turns on a fallacious reading of cases on government speech, the other on a mistaken assessment of protection available under whistle-blower statutes.
A
The majority accepts the fallacy propounded by the county petitioners and the Federal Government as amicus that any statement made within the scope of public employment is (or should be treated as) the government’s own speech, see ante, at 421-422, and should thus be differentiated as a matter of law from the personal statements the First Amendment protects, see Broadrick v. Oklahoma, 413 U. S. 601, 610 (1973). The majority invokes the interpretation set out in Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819 (1995), of Rust v. Sullivan, 500 U. S. 173 (1991), which *437 held there was no infringement of the speech rights of Title X funds recipients and their staffs when the Government forbade any on-the-job counseling in favor of abortion as a method of family planning, id., at 192-200. We have read Rust to mean that “when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.” Rosenberger, supra, at 833.
The key to understanding the difference between this case and Rust lies in the terms of the respective employees’ jobs and, in particular, the extent to which those terms require espousal of a substantive position prescribed by the government in advance. Some public employees are hired to “promote a particular policy” by broadcasting a particular' message set by the government, but not everyone working for the government, after all, is hired to speak from a government manifesto. See Legal Services Corporation v. Velazquez, 531 U. S. 533, 542 (2001). There is no claim or indication that Ceballos was hired to perform such a speaking assignment. He was paid to enforce the law by constitutional action: to exercise the county government’s prosecutorial power by acting honestly, competently, and constitutionally. The only sense in which his position apparently required him to hew to a substantive message was at the relatively abstract point of favoring respect for law and its evenhanded enforcement, subjects that are not at the level of controversy in this case and were not in Rust. Unlike the doctors in Rust, Ceballos was not paid to advance one specific policy among those legitimately available, defined by a specific message or limited by a particular message forbidden. The county government’s interest in his speech cannot therefore be equated with the terms of a specific, prescribed, or forbidden substantive position comparable to the Federal Government’s interest in Rust, and Rust is no authority for the notion that government may exercise plenary control over every comment made by a public employee in doing his job.
*438 It is not, of course, that the district attorney lacked interest of a high order in what Ceballos might say. If his speech undercut effective, lawful prosecution, there would have been every reason to rein him in or fire him; a statement that created needless tension among law enforcement agencies would be a fair subject of concern, and the same would be true of inaccurate statements or false ones made in the course of doing his work. But these interests on the government’s part are entirely distinct from any claim that Ceballos’s speech was government speech with a preset or proscribed content as exemplified in Rust. Nor did the county petitioners here even make such a claim in their answer to Ceballos’s complaint, see n. 13, infra.
The fallacy of the majority’s reliance on Rosenberger’s understanding of Rust doctrine, moreover, portends a bloated notion of controllable government speech going well beyond the circumstances of this case. Consider the breadth of the new formulation:
“Restricting speech that owes its existence to a public employee’s professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.” Ante, at 421-422.
This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor, and I have to hope that today’s majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write “pursuant to ... official duties.” See Grutter v. Bollinger, 539 U. S. 306, 329 (2003) (“We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional *439 tradition”); Keyishian v. Board of Regents of Univ. of State of N. Y., 385 U. S. 589, 603 (1967) (“Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. ‘The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools’ ” (quoting Shelton v. Tucker, 364 U. S. 479, 487 (1960))); Sweezy v. New Hampshire, 354 U. S. 234, 250 (1957) (a governmental enquiry into the contents of a scholar’s lectures at a state university “unquestionably was an invasion of [his] liberties in the areas of academic freedom and political expression — areas in which government should be extremely reticent to tread”).
B
The majority’s second argument for its disputed limitation of Pickering doctrine is that the First Amendment has little or no work to do here owing to an assertedly comprehensive complement of state and national statutes protecting government whistle-blowers from vindictive bosses. See ante, at 425-426. But even if I close my eyes to the tenet that “‘[t]he applicability of a provision of the Constitution has never depended on the vagaries of state or federal law,’” Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668, 680 (1996), the majority’s counsel to rest easy fails on its own terms.[7]
*440 To begin with, speech addressing official wrongdoing may well fall outside protected whistle-blowing, defined in the classic sense of exposing an official’s fault to a third party or to the public; the teacher in Givhan, for example, who raised the issue of unconstitutional hiring bias, would not have qualified as that sort of whistle-blower, for she was fired after a private conversation with the school principal. In any event, the combined variants of statutory whistle-blower definitions and protections add up to a patchwork, not a showing that worries may be remitted to legislatures for relief. See D. Westman & N. Modesitt, Whistleblowing: Law of Retaliatory Discharge 67-75,281-307 (2d ed. 2004). Some state statutes protect all government workers, including the employees of municipalities and other subdivisions;[8] others stop at state employees.[9] Some limit protection to employees who tell their bosses before they speak out;[10] others forbid bosses from imposing any requirement to warn.[11] As for the federal Whistleblower Protection Act of 1989, 5 *441 U. S. C. § 1213 et seq. (2000 ed. and Supp. III), current case law requires an employee complaining of retaliation to show that “ ‘a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence gross mismanagement,’” White v. Department of Air Force, 391 F. 3d 1377, 1381 (CA Fed. 2004) (quoting Lachance v. White, 174 F. 3d 1378, 1381 (CA Fed. 1999), cert. denied, 528 U. S. 1153 (2000)). And federal employees have been held to have no protection for disclosures made to immediate supervisors, see Willis v. Department of Agriculture, 141 F. 3d 1139, 1143 (CA Fed. 1998); Horton v. Department of Navy, 66 F. 3d 279, 282 (CA Fed. 1995), cert. denied, 516 U. S. 1176 (1996), or for statements of facts publicly known already, see Francisco v. Office of Personnel Management, 295 F. 3d 1310, 1314 (CA Fed. 2002). Most significantly, federal employees have been held to be unprotected for statements made in connection with normal employment duties, Huffman v. Office of Personnel Management, 263 F. 3d 1341, 1352 (CA Fed. 2001), the very speech that the majority says will be covered by “the powerful network of legislative enactments . . . available to those who seek to expose wrongdoing,” ante, at 425.[12] My point is not to disparage particular statutes or speak here to the merits of interpretations by other federal courts, but merely to show the current understanding of statutory protection: individuals doing the same sorts of governmental jobs and saying the same sorts of things addressed to civic concerns will get different protection depending on the local, state, or federal jurisdictions that happened to employ them.
Ill
The Court remands because the Court of Appeals considered only the disposition memorandum and because Ceballos *442 charges retaliation for some speech apparently outside the ambit of utterances “pursuant to their official duties.” When the Court of Appeals takes up this case once again, it should consider some of the following facts that escape emphasis in the majority opinion owing to its focus.[13] Ceballos says he sought his position out of a personal commitment to perform civic work. After showing his superior, petitioner Frank Sundstedt, the disposition memorandum at issue in this case, Ceballos complied with Sundstedt’s direction to tone down some accusatory rhetoric out of concern that the memorandum would be unnecessarily incendiary when shown to the Sheriff’s Department. After meeting with members of that department, Ceballos told his immediate supervisor, petitioner Carol Najera, that he thought Brady v. Maryland, 373 U. S. 83 (1963), obliged him to give the defense his internal memorandum as exculpatory evidence. He says that Najera responded by ordering him to write a new memorandum containing nothing but the deputy sheriff’s statements, but that he balked at that. Instead, he proposed to turn over the existing memorandum with his own conclusions redacted as work product, and this is what he did. The issue over revealing his conclusions arose again in preparing for the suppression hearing. Ceballos maintains that Sundstedt ordered Najera, representing the prosecution, to give the trial judge a full picture of the circumstances, but that Najera told Ceballos he would suffer retaliation if he testified that the affidavit contained intentional fabrications. In any event, Ceballos’s testimony generally stopped short of his own conclusions. After the hearing, the trial judge denied the motion to suppress, explaining that he found grounds independent of the challenged material sufficient to show probable cause for the warrant.
*443 Ceballos says that over the next six months his supervisors retaliated against him[14] not only for his written reports, see ante, at 415, but also for his spoken statements to them and his hearing testimony in the pending criminal case. While an internal grievance filed by Ceballos challenging these actions-was pending, Ceballos spoke at a meeting of the Mexican-American Bar Association about misconduct of the Sheriff’s Department in the criminal case, the lack of any policy at the District Attorney’s Office for handling allegations of police misconduct, and the retaliatory acts he ascribed to his supervisors. Two days later, the office dismissed Ceballos’s grievance, a result he attributes in part to his bar association speech.
Ceballos’s action against petitioners under 42 U. S. C. § 1983 claims that the individuals retaliated against him for exercising his First Amendment rights in submitting the memorandum, discussing the matter with Najera and Sundstedt, testifying truthfully at the hearing, and speaking at the bar meeting.[15] As I mentioned, the Court of Appeals *444 saw no need to address the protection afforded to Ceballos’s statements other than the disposition memorandum, which it thought was protected under the Pickering test. Upon remand, it will be open to the Court of Appeals to consider the application of Pickering to any retaliation shown for other statements; not all of those statements would have been made pursuant to official duties in any obvious sense, and the claim relating to truthful testimony in court must surely be analyzed independently to protect the integrity of the judicial process.

 It seems stranger still in light of the majority’s concession of some First Amendment protection when a public employee repeats statements made pursuant to his duties but in a separate, public forum or in a letter to a newspaper. Ante, at 423-424.

I do not say the value of speech “pursuant to . . . duties” will always be greater, because I am pessimistic enough to expect that one response to the Court’s holding will be moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview. Now that the government can freely penalize the school personnel officer for criticizing the principal because speech on the subject falls within the personnel officer’s job responsibilities, the government may well try to limit the English teacher’s options by the simple expedient of defining teachers’ job responsibilities expansively, investing them with a general obligation to ensure sound administration of the school. Hence today’s rule presents the regrettable prospect that protection under Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563 (1968), may be diminished by expansive statements of employment duties.
The majority’s response, that the enquiry to determine duties is a “practical one,” ante, at 424, does not alleviate this concern. It sets out a standard that will not discourage government employers from setting duties'expansively, but will engender litigation to decide which stated duties were actual and which were merely formal.

 R. Frost, Two Tramps in Mud Time, Collected Poems, Prose, & Plays 251, 252 (R. Poirier & M. Richardson eds. 1995).

 Not to put too fine a point on it, the Human Resources Division of the Los Angeles County District Attorney’s Office, Ceballos’s employer, is telling anyone who will listen that its work “provides the personal satisfaction and fulfillment that comes with knowing you are contributing essential services to the citizens of Los Angeles County.” Career Opportunities, http://da.co.la.ca.us/hr/default.htm (all Internet materials as visited May 25, 2006, and available in Clerk of Court’s case file).
The United States expresses the same interest in identifying the individual ideals of a citizen with its employees’ obligations to the Government. See Brief as Amicus Curiae 25 (stating that public employees are motivated to perform their duties “to serve the public”). Right now, for example, the U. S. Food and Drug Administration is appealing to physicians, scientists, and statisticians to work in the Center for Drug Evaluation and Research, with the message that they “can give back to [their] community, state, and country by making a difference in the lives of Americans everywhere.” Career Opportunities at CDER: You Can Make a Difference, http://www.fda.gov/cder/career/default.htm. Indeed, the Congress of the United States, by concurrent resolution, has previously expressly endorsed respect for a citizen’s obligations as the prime responsibility of Government employees: “Any person in Government Service should: . . . [p]ut loyalty to the highest moral principles and to country above loyalty to persons, party, or Government department,” and shall “[ejxpose corruption wherever discovered,” Code of Ethics for Government Service, H. Con. Res. 175, 85th Cong., 2d Sess. (1958), 72 Stat. B12. Display of this Code in Government buildings was once required by law, 94 Stat. 855; this obligation has been repealed, Office of Government Ethics Authorization Act of 1996, Pub. L. 104-179, § 4,110 Stat. 1566.

 As I also said, a public employer is entitled (and obliged) to impose high standards of honesty, accuracy, and judgment on employees who speak in doing their work. These criteria are not, however, likely to discourage meritless litigation or provide a handle for summary judgment. The employee who has spoken out, for example, is unlikely to blame himself for prior bad judgment before he sues for retaliation.

 According to the majority’s logic, the litigation it encourages would have the unfortunate result of “demand[ing] permanent judicial intervention in the conduct of governmental operations,” ante, at 423.

 Even though this Court has recognized that 42 U. S. C. § 1983 “does not authorize a suit for every alleged violation of federal law,” Livadas v. Bradshaw, 512 U. S. 107, 132 (1994), the rule is that “§ 1983 remains a generally and presumptively available remedy for claimed violations of federal law,” id., at 133. Individual enforcement under § 1983 is rendered unavailable for alleged violations of federal law when the underlying statutory provision is part of a federal statutory scheme clearly incompatible with individual enforcement under § 1983. See Rancho Palos Verdes v. Abrams, 544 U. S. 113, 119-120 (2005).

 Del. Code Ann., Tit. 29, §5115 (2003); Fla. Stat. §112.3187 (2003); Haw. Rev. Stat. §378-61 (1993); Ky. Rev. Stat. Ann. §61.101 (West 2005); Mass. Gen. Laws, ch. 149, §185 (West 2004); Nev. Rev. Stat. §281.611 (2003); N. H. Rev. Stat. Ann. §275-E:l (Supp. 2005); Ohio Rev. Code Ann. §4113.51 (Lexis 2001); Term. Code Ann. §50-1-304 (2005).

 Ala. Code §36-26A-l et seq. (2001); Colo. Rev. Stat. §24-50.5-101 et seq. (2004); Iowa Code § 70A.28 et seq. (2005); Kan. Stat. Ann. § 75-2973 (2003 Cum. Supp.); Mo. Rev. Stat. § 105.055 (2004 Cum. Supp.); N. C. Gen. Stat. Ann. § 126-84 (Lexis 2003); Okla. Stat., Tit. 74, §840-2.5 et seq. (West Supp. 2005); Wash. Rev. Code §42.40.010 (2004); Wyo. Stat. Ann. § 9-11-102 (2003).

 Idaho Code § 6-2104(l)(a) (Lexis 2004); Me. Rev. Stat. Ann., Tit. 26, §833(2) (1988); Mass. Gen. Laws, eh. 149, § 185(c)(1) (West 2004); N. H. Rev. Stat. Ann. §275-E:2(II) (1999); N. J. Stat. Ann. §34:19-4 (West 2000); N. Y. Civ. Serv. Law Ann. §75-b(2)(b) (West 1999); Wyo. Stat. Ann. § 9-11-103(b) (2003).

 Kan. Stat. Ann. § 75-2973(d)(2) (2003 Cum. Supp.); Ky. Rev. Stat. Ann. §61.102(1) (West 2005); Mo. Rev. Stat. §105.055(2) (2004 Cum. Supp.); Okla. Stat., Tit. 74, § 840-2.5(B)(4) (West 2005 Supp.); Ore. Rev. Stat. § 659A.203(l)(c) (2003).

 See n. 4, supra.

 This case comes to the Court on the motions of petitioners for summary judgment, and as such, “[t]he evidence of [Ceballos] is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U. S. 242, 255 (1986).

 Sundstedt demoted Ceballos to a trial deputy; his only murder case was reassigned to a junior colleague with no experience in homicide matters, and no new murder cases were assigned to him; then-District Attorney Gil Garcetti, relying in part on Sundstedt’s recommendation, denied Ceballos a promotion; finally, Sundstedt and Najera transferred him to the office’s El Monte Branch, requiring longer commuting. Before transferring Ceballos, Najera offered him a choice between transferring and remaining at the Pomona Branch prosecuting misdemeanors instead of felonies. When Ceballos refused to choose, Najera transferred him.

 The county petitioners’ position on these claims is difficult to follow or, at least, puzzling. In their motion for summary judgment, they denied that any of their actions was responsive to Ceballos’s criticism of the sheriff’s affidavit. E. g., App. 159-160, 170-172 (maintaining that Ceballos was transferred to the El Monte Branch because of the decreased workload in the Pomona Branch and because he was next in a rotation to go there to serve as a “filing deputy”); id., at 160, 172-173 (contending that Ceballos’s murder case was reassigned to a junior colleague to give that attorney murder trial experience before he was transferred to the Juvenile Division of the District Attorney’s Office); id., at 161-162, 173-174 (arguing that *444 Ceballos was denied a promotion by Garcetti despite Sundstedt’s stellar review of Ceballos, when Garcetti was unaware of the matter in People v. Cuskey, the criminal case for which Ceballos wrote the pertinent disposition memorandum). Their reply to Ceballos’s opposition to summary judgment, however, shows that petitioners argued for a Pickering assessment (for want of a holding that Ceballos was categorically disentitled to any First Amendment protection) giving great weight in their favor to workplace disharmony and distrust caused by Ceballos’s actions. E. g., App. 477-478.